[Civ. No. 16026. Third Dist. Feb. 9, 1977.]

BRADFORD J. JEFFRY et al., Plaintiffs and Respondents, v.
L. J. POUNDS et al., Defendants and Appellants.

**COUNSEL**

William Frank Roberts for Defendants and Appellants.

Jones, Lane, Weaver & Webster and Daniel S. Lane for Plaintiffs and Respondents.

## OPINION

**FRIEDMAN, Acting P. J.**—This attorney fee suit is countered by the charge that the plaintiff lawyers breached their professional responsibilities toward their client. Defendants are the client and his new attorney. They appeal from an adverse judgment.

The facts are revealed by a settled statement and by findings of the trial court. Plaintiffs Jeffry, Gibson and Barbour are a law firm. In May 1973 defendant L. J. Pounds was injured in an automobile accident. He had a long acquaintance with Mr. Gibson, asked the latter to represent him and signed an agreement retaining Gibson's firm. Gibson turned conduct of the case over to Barbour, his law partner, who interviewed Pounds and commenced a damage action. During 1973 and 1974 Barbour took depositions, held settlement discussions, filed an at-issue memorandum and secured a settlement conference date and an April 1975 trial date.

Meanwhile Pounds had consulted another attorney, defendant William Roberts, concerning his marital problems. Roberts prepared a proposed property settlement agreement and submitted it to Mrs. Pounds. Dissatisfied with the proposal, Mrs. Pounds consulted plaintiff Gibson, who agreed to represent her in a marital dissolution suit. At this point the record falls into disarray—one trial court finding declares that Gibson agreed to represent her on February 25, 1974, another that she first consulted him on September 25, 1974. The settled statement recites that Gibson undertook Mrs. Pounds' representation without the knowledge of Barbour (his law partner) and without knowledge of the status of the personal injury litigation.[1]

In late January 1975 Gibson wrote Roberts, asserting that Mrs. Pounds claimed an interest in her husband's retirement fund. (Pounds had retired from active employment in December 1973 and was receiving a retirement pension.) When Pounds heard of this claim, he instructed Roberts to take his personal injury case out of the hands of the Gibson-Barbour law firm. In February 1975 the attorneys participated in a property settlement between Mr. and Mrs. Pounds, with the understanding that Mrs. Pounds would now seek an interlocutory dissolution

---

[1] The settled statement does not recite that Gibson was ignorant that his firm was concurrently representing the husband in the latter's personal injury action; nor does it recite that Gibson asked his law partner about the status of the personal injury litigation.

of marriage. Later that month, by a substitution of attorneys, Roberts took over prosecution of Pounds' personal injury suit. Barbour made it plain that he would seek part of any fee payable from the personal injury recovery. In April 1975 Roberts effected a settlement of the personal injury suit for $4,000 and received a $1,000 fee. The trial court allowed plaintiffs $500 as the reasonable value of their legal services in the personal injury case, payable out of Roberts' fee.

A client has an absolute right to discharge his attorney but must pay for the reasonable value of the attorney's services performed up to the time of discharge. (*Fracasse* v. *Brent,* 6 Cal.3d 784, 790-792 [100 Cal.Rptr. 385, 494 P.2d 9].) The general doctrine is qualified by the rule that acts of impropriety inconsistent with the character of the legal profession and incompatible with the faithful discharge of professional duties will prevent an attorney from recovering for his services. (*Clark* v. *Millsap,* 197 Cal. 765, 785 [242 P. 918]; *Goldstein* v. *Lees,* 46 Cal.App.3d 614, 618 [120 Cal.Rptr. 253].)

On appeal defendants assert that an attorney should be barred from recovering a fee when the client has discharged him for accepting employment hostile to the client's interests. Both in the trial court and on appeal the parties' debate has revolved around two precepts of professional responsibility. One is Business and Professions Code section 6068, which declares: "It is the duty of an attorney: . . . (e) To maintain inviolate the confidence, and at every peril to himself to preserve the secrets, of his client." The other is rule 4-101, Rules of Professional Conduct of the State Bar of California, which prohibits an attorney from accepting employment adverse to a client or former client involving use of the latter's confidential information. In allowing recovery, the trial court concluded that plaintiffs had not violated professional canons by taking on the wife's dissolution suit against their personal injury client. Its conclusion was premised on the finding that Mr. Pounds, first of the two clients in point of time, had retired and was drawing a pension, hence that pursuit of his personal injury claim entailed no confidential financial information which might aid Mrs. Pounds' marital litigation.

Both in the trial court and on appeal the inquiry has been too narrow. Both section 6068, subdivision (e) and rule 4-101 are aimed to protect the confidential relationship between attorney and client. (See *Goldstein* v. *Lees, supra,* 46 Cal.App.3d at p. 619; *Kraus* v. *Davis,* 6 Cal.App.3d 484, 490-491 [85 Cal.Rptr. 846].) The strictures against dual representa-

tion of antagonistic interests are far broader; they arise without potential breaches of confidentiality. In California these strictures are codified in rule 5-102 of the Rules of Professional Conduct.[2] The rule declares: "(A) A member of the State Bar shall not accept professional employment without first disclosing his relation, if any, with the adverse party, and his interest, if any, in the subject matter of the employment. A member of the State Bar who accepts employment under this rule shall first obtain the client's written consent to such employment. ¶ (B) A member of the State Bar shall not represent conflicting interests, except with the written consent of all parties concerned."

The question here is whether a lawyer or law firm breaches rule 5-102(B), when, without the knowledge and consent of a current client, it undertakes to represent a third person in suing that client on an unrelated matter. We answer the question in the affirmative.

The need for disclosure and consent of all parties arises not only where multiple clients' antagonisms are confined to a single controversy. (See, e.g., *Lysick* v. *Walcom* (1968) 258 Cal.App.2d 136, 146-147 [65 Cal.Rptr. 406, 28 A.L.R.3d 368]; *Ishmael* v. *Millington* (1966) 241 Cal.App.2d 520, 526-528 [50 Cal.Rptr. 592].) It extends, as well, to situations where antagonism pervades the client's relationship, stimulating the first client to doubt his attorney's loyalty when the latter accepts unrelated but antagonistic employment. Absent disclosure and consent, the attorney should neither represent a claim inconsistent with his client's interest nor represent two clients with conflicting interests. (*Hammett* v. *McIntyre* (1952) 114 Cal.App.2d 148, 155 [249 P.2d 885]; *McClure* v. *Donovan* (1947) 82 Cal.App.2d 664, 666 [186 P.2d 718].) "It is . . . a violation of [an attorney's] duty for him to assume a position adverse or antagonistic to his client without the latter's free and intelligent consent given after full knowledge of all the facts and circumstances . . . ." (*Anderson* v. *Eaton* (1930) 211 Cal. 113, 116 [393 P. 788].)

Some authorities verbalize these constraints by resort to the cliche that no person may serve two masters, i.e., the attorney should avoid inner conflicts of loyalty. The sentiment is valid enough but errs by overrating the lawyer's discomposure and underrating the client's. Professional

---

[2]The Rules of Professional Conduct of the State Bar of California received extensive revision and, as revised, were approved by the California Supreme Court and became effective January 1, 1975. Present rule 5-102 is the successor of former rules 6 and 7, which were operative when the events of this lawsuit occurred. The revision made no substantive change affecting this litigation.

responsibility rules seek the objective of public confidence, as well as internal integrity.[3] A lay client is likely to doubt the loyalty of a lawyer who undertakes to oppose him in an unrelated matter. Hence the decisions condemn acceptance of employment adverse to a client even though the employment is unrelated to the existing representation.[4] Basis of the condemnation is the client's loss of confidence, not the attorney's inner conflicts.

There is no record that plaintiff Gibson sought the consent of Mr. Pounds, his firm's client, before he undertook to represent Mrs. Pounds in her marital dissolution action. He violated rule 5-102(B) by undertaking that representation without the written consent of both parties.

We do not charge plaintiffs with dishonest purpose or deliberately unethical conduct. The uninhibited acceptance of a lawsuit against a current client does arouse concern.[5] Only recently has the subject of professional responsibility become a mandatory part of law school curricula and included in bar examinations. Desultory, on-the-job education in legal ethics results in insensitivity and shallow perceptions. As an educational instrumentality the California Rules of Professional

[3]The Preamble of the American Bar Association's Code of Professional Responsibility (1970) declares: " . . . in the last analysis it is the desire for the respect and confidence of the members of his profession and of the society which he serves that should provide to a lawyer the incentive for the highest possible degree of ethical conduct. The possible loss of that respect and confidence is the ultimate sanction."

[4]Canon 5 of the American Bar Association's Code of Professional Responsibility declares: "A lawyer should exercise independent professional judgment on behalf of a client." In explanation of this canon, Ethical Consideration 5-15 points out that a lawyer should resolve all doubts against representing multiple clients having potentially differing interests; that he should never represent *in litigation* multiple clients with differing interests.

Construing canon 5, a federal court declares that a lawyer who would sue his own client, asserting lack of substantial relationship between the litigation and the work he is performing for the client, "is leaning on a slender reed indeed." (*Cinema 5, Ltd.* v. *Cinerama, Inc.* (1976) 528 F.2d 1384, 1386.) The Connecticut Supreme Court of Errors has pointed out: "If, as in this case, [the client] is sued and his home attached by his own attorney, who is representing him in another matter, all feeling of loyalty is necessarily destroyed . . . ." (*Grievance Com. of Bar of Hartford County* v. *Rottner* (1964) 152 Conn. 59 [203 A.2d 82, 84]; see additional cases in Annot. 17 A.L.R.3d 835, § 13, pp. 849-850.)

[5]A parallel situation moved the Supreme Court of Errors of Connecticut to comment: "The almost complete absence of authority governing the situation where, as in the present case, the lawyer is still representing the client whom he sues clearly indicates to us that the common understanding and the common conscience of the bar is in accord with our holding that such a suit constitutes a reprehensible breach of loyalty and a violation of the preamble to the Canons of Professional Ethics." (*Grievance Com. of Bar of Hartford County* v. *Rottner, supra,* 203 A.2d at p. 85 fn. 4.)

Conduct are singularly uninspiring. They intermix fundamental tenets of ethical obligation with a turgid mass of superficial do's and don'ts, comparably to strewing the Ten Commandments among the interstices of the Internal Revenue Code. The California rules evoke comparison to the Code of Professional Responsibility of the American Bar Association, which became effective in 1970. The latter was deliberately couched in educational and aspirational terms.[6] Published reports preceding adoption of the California rules reveal no reason why the draftsmen rejected the format of the ABA Code.[7] The California rules, in any event, do not supply the vigorous guidance emanating from the latter.[8] The deficiency is one of design, not content.

█ Plaintiffs are entitled to compensation for services supplied preceding the breach of professional conduct. (*Magee* v. *Brenneman,* 188 Cal. 562, 571 [206 P. 37]; see also, *Schaefer* v. *Berinstein,* 180 Cal.App.2d 107, 135 [4 Cal.Rptr. 236].) The trial court found plaintiffs free of any breach but allowed a fee for services only up to September 25, 1974, when a "possible conflict of interest arose" through the filing of Mrs. Pounds' marital dissolution suit. The trial court's affirmation of professional propriety is contradicted by its conflict-of-interest characterization. At any rate, the violation of rule 5-102 occurred either on February 25, 1974, or on September 25, 1974, when Gibson undertook to represent Mrs. Pounds in her marital dissolution proceedings against Mr. Pounds, his firm's current client. The trial court should limit plaintiffs' fee to the value of services rendered before the date of the violation, whatever that date was.

The judgment is reversed and the cause remanded for proceedings consistent with this opinion. Defendants will recover appeal costs.

Janes, J., and Evans, J., concurred.

---

[6]The authors of the ABA Code acknowledge the influence of Mr. Justice (later Chief Justice) Harlan Fiske Stone, who urged appraisal of lawyer-client relationships *beyond the petty detail of form and manner*; they voice dissatisfaction with the old Canons because they were not an *effective teaching instrument.* (ABA Code of Prof. Responsibility (1970) Preface, p. i.) The ABA's format was shaped by the need for an *inspirational guide* as well as a basis for disciplinary action; it was designed in three interrelated parts, consisting of Canons or general norms, Ethical Considerations of an aspirational character and mandatory Disciplinary Rules. (*Id.,* Preamble and Preliminary Statement, p. 1.)

[7]See 48 State Bar J. 328 (1973); 49 State Bar J. 542 (1974).

[8]Had plaintiffs consulted canon 5 of the ABA Code, they would have found an annotation providing two illuminating excerpts from the Connecticut decision in *Grievance Com. of Bar of Hartford County* v. *Rottner, supra.*