[No. S031687. Dec. 28, 1994.]

GAIL F. FLATT et al., Petitioners, v.
THE SUPERIOR COURT OF SONOMA COUNTY, Respondent;
WILLIAM DANIEL, Real Party in Interest.

## COUNSEL

Lewis, D'Amato, Brisbois & Bisgaard, David B. Paynter, Thomas J. Feeney and Paul Ellis Baron for Petitioners.

No appearance for Respondent.

William B. Daniels II, Paul G. Krawchuk and Susan A. Mitchell for Real Party in Interest.

## OPINION

**ARABIAN, J.**—We granted review in this legal malpractice action to consider the scope of an attorney's duty to give advice when severing a relationship with a new or prospective client after learning that the representation—involving the filing of a lawsuit—would conflict irreconcilably with the duty of loyalty owed to an *existing* client, the target of the contemplated litigation. We conclude that the requirement of undivided loyalty to the first client negates any duty on the part of the attorney to inform the second client

of the statute of limitations applicable to the proposed lawsuit or even of the advisability of seeking alternative counsel, the two purported advisory duties that form the basis for this action for damages against the attorney by the second client.

Our holding is narrow, confined to the circumstances typified by this case —one in which the attorney is confronted with a mandatory and unwaivable duty *not* to represent the second client in light of an irremediable conflict with the existing client and acts promptly to terminate the relationship after learning of the conflict. We caution the bar that, in the absence of such an irreducible conflict and mandatory duty to withdraw, an attorney's duty to advise a new or even a "prospective" client, once the nonengagement decision has been taken, may well be more extensive; that, however, is a separate question, one not implicated by the principle of attorney loyalty that is the focus of our concern in this case.

## I

Our account of the facts is taken from the record before the superior court in ruling on defendants' motion for summary judgment; that is, we review the trial court's decision de novo, applying the rule that "[a] defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. [Citation.] To succeed, the defendant must . . . demonstrate that under no hypothesis is there a material issue of fact that requires the process of a trial." (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].)

William Daniel owned a two-thirds interest in a steel business and related assets acquired in a 1980 transaction structured by his then attorney, Donald Hinkle. On June 20, 1989, in the course of a marital dissolution proceeding, a superior court judge ruled that Daniel's wife had a community interest in the steel business and entered an interlocutory order to that effect. Unhappy with that result and believing it was the outcome of faulty lawyering by Hinkle in devising the 1980 acquisition, Daniel telephoned defendant Gail Flatt, an attorney with the defendant O'Brien law partnership, on July 20, 1989, one month after the decree was filed, and discussed his grievance. He arranged to meet personally with Flatt on July 27.

During an hour-long meeting on July 27, Daniel disclosed confidential information to Flatt concerning the conduct of Hinkle in structuring the 1980 transaction and turned over several documents bearing on that event. According to Daniel's subsequent declaration, filed in opposition to defendants'

motion for summary judgment, Flatt told him that he "definitely" had a claim for legal malpractice against Hinkle arising out of the dissolution proceeding and the antecedent purchase of the steel business.

In a letter dated August 3, a week after the July 27 meeting, Flatt returned Daniel's documents and advised him she could not represent him "in an action against [Hinkle]" because her firm "has a conflict . . . in that we represent [Hinkle's firm] in an unrelated matter." At his deposition, Daniel later recalled that he understood Flatt's firm had declined to represent him and that he would need to continue his search for counsel ("[They said,] 'Hey, we can't represent you. We've got a conflict of interest.' Fine. . . . you can't represent me. So I've got to find somebody else"). He put off that search for a year and a half, however, because of other matters.

On June 3, 1991, almost two years after the July 27 meeting, Daniel filed this suit against the Hinkle firm (with respect to matters arising out of the 1980 business acquisition and the 1987 interlocutory decree) and Flatt and the other partners of her firm (collectively, Flatt). The latter claim alleged that Flatt had breached a duty to Daniel to advise him of the statute of limitations governing his claims against Hinkle and to seek other counsel in order to avoid having those claims time-barred; Daniel sought damages for legal malpractice against Flatt and her firm in the event that the court determined that the claims against Hinkle were barred by the statute of limitations.

Following discovery, Flatt moved for summary judgment on the ground that she owned no duty to advise Daniel as alleged in the complaint, because any advice concerning the statute of limitations governing the claim against Hinkle or to seek other counsel with respect to that matter would have been contrary to Hinkle's interests. The trial court declined to grant defendants' motion for summary judgment, reasoning that there were triable issues of fact material to the issue of whether an attorney-client relationship had arisen between Flatt and Daniel; Flatt then sought a writ of mandate from the Court of Appeal.

After that court refused to intervene, Flatt pursued relief here. We granted her petition for review and transferred the cause to the Court of Appeal for issuance of an alternative writ. The ensuing decision by a divided court affirmed the ruling of the trial court. The majority's reasoning was confined entirely to the question of whether, as a result of the July 27 meeting and surrounding circumstances, Daniel had become a client of Flatt and her firm, and specifically whether issues of fact material to a resolution of that question remained for trial. After sifting through the record made by the

parties in the trial court and reviewing the case law governing the formation of the attorney-client relationship, the majority concluded that a professional relationship *could* have been formed under the version of the meeting alleged by Daniel; it therefore declined to disturb the trial court's ruling denying defendants' motion for summary judgment on the ground that facts material to that issue remained in dispute.

The dissenting justice reasoned that the dispositive issue was not whether Daniel had become a client of Flatt as a result of the July 27 meeting, but assuming *he had,* whether Flatt thereby owed a duty to advise him of the statute of limitations governing his contemplated malpractice claim against Hinkle and the advisability of retaining other counsel to pursue it. As will appear, we agree in part with the reasoning of the dissenting Court of Appeal justice. In our view, *assuming* that the circumstances of the July 27 meeting were sufficient to make Daniel a client of Flatt, her duty of loyalty to Hinkle, the firm's existing client, required her both to sever any professional relation with Daniel promptly upon learning of the conflict and, as a legal complement to that obligation, absolved her of a duty to provide *any* advice to Daniel adverse to the interests of Hinkle, including advice respecting the statute of limitations governing, and the advisability of engaging alternative counsel to pursue, the contemplated lawsuit against Hinkle claimed by Daniel to have been required of Flatt and breached in this case.

## II

We have little quarrel with the reasoning of the majority of the Court of Appeal as to whether Daniel's status with respect to Flatt and her firm was that of a client. Given the shape of our law governing the nature of the attorney-client relationship, ably reviewed in the majority opinion—including its emphasis on the factual nature underlying the formation of the professional relation—we willingly indulge the assumption that, given the record before the superior court on defendants' motion for summary judgment, Daniel *might* have been Flatt's client; in any event, we agree with the Court of Appeal majority that issues of fact material to that question remained in dispute.[1] We disagree, however, with the majority's implicit assumption that the question of Daniel's client status is itself material to the dispositive legal issue raised by defendants' motion for summary judgment.

[1] In concluding that, if credited, Daniel's version of events surrounding the July 27 meeting might support the inference that an attorney-client relationship had arisen, the Court of Appeal majority contrasted the results in *Fox* v. *Pollack* (1986) 181 Cal.App.3d 954 [226 Cal.Rptr. 532] (plaintiffs went to the office of the attorney representing their vendors to sign land sale papers; the attorney read the papers to them and asked if they understood them; plaintiffs later filed suit against the attorney, complaining that the documents varied from the oral agreement; *held*, the fact that plaintiffs "thought" defendant was their attorney was insufficient to create an attorney-client relationship unilaterally, absent some objective

## A

■ An attorney's duty of loyalty to a client is not one that is capable of being divided, at least under circumstances where the ethical obligation to withdraw from further representation of one of the parties is mandatory, rather than subject to disclosure and client consent. Although the principle upon which that conclusion rests is integral to the nature of an attorney's duty of loyalty itself, the result is also compelled by the highly practical dilemma that an advisory duty to the erstwhile client would impose on the attorney. In addition, our conclusion is motivated by an appreciation of the damage done to the existing client's sense of trust and security—features essential to the effective functioning of the fiduciary relationship—likely to follow from a conclusion that Flatt had a duty to advise Daniel under the facts of this case.

Neither the parties' research nor our own has unearthed case authority squarely in point. ■ The dispositive principle, however, can be derived from the well established ethical stricture against attorney conflicts of interest embodied in rule 3-310 of our Rules of Professional Conduct (hereafter Rule 3-310). Subdivision (C)(2) of Rule 3-310—and its counterparts in the Model Code of Professional Responsibility and the Model Rules of Professional Conduct, both promulgated by the American Bar Association (ABA)—provides that an attorney "shall not . . . [¶] . . . [¶] [a]ccept or continue representation of more than one client in a matter in which the interests of the clients actually conflict . . . ."[2] The practical administration of the rule has not been confined to what is perhaps the most egregious

evidence of an agreement to represent) with that in *Miller* v. *Metzinger* (1979) 91 Cal.App. 3d 31 [118 Cal.Rptr. 398] (reversing summary judgment for defendant attorney where client testified that, although no fee had been paid, attorney had agreed to obtain her medical records, evaluate her claim, and advise her as to the appropriate action and evidence suggested that attorney knew statute of limitations would expire less than a month before he referred the case to another attorney). (See also *Beery* v. *State Bar* (1987) 43 Cal.3d 802 [239 Cal.Rptr. 121, 739 P.2d 1289]; *Westinghouse Elec. Corp.* v. *Kerr-McGee Corp.* (7th Cir. 1978) 580 F.2d 1311.) The majority concluded that, based on Daniel's declaration of what occurred at the meeting with Flatt—including his assertion (contradicting his prior deposition testimony) that Flatt had given him "a little bit of an opinion" as to whether or not he had a valid claim against Hinkle—"an attorney-client relationship could rest upon the version of the interaction claimed by [Daniel]."

[2]The classic effort at formulating an encompassing definition of attorney-client conflicts of interest—and one still cited in judicial opinions—was canon 6 of the ABA's 1908 Canons of Professional Ethics: "a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose." (See, e.g., authorities cited in McMunigal, *Rethinking Attorney Conflict of Interest Doctrine* (1992) 5 Geo. J. Legal Ethics 823, 844, fn. 96.) Later influential efforts at defining the scope and content of the prohibition include rules 1.7 ("A lawyer shall not represent a client if the representation . . . will be directly adverse to another client . . . .") and 1.9 ("A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in

example of its violation—simultaneously representing opposing parties in the same litigation. Rather, in parsing the effect of the ethical principle against attorney-client conflicts of interest in a variety of settings, the courts have identified two separate interests underlying the prohibition and formulated two distinct tests to determine the circumstances in which each applies.

Where the potential conflict is one that arises from the *successive* representation of clients with potentially adverse interests, the courts have recognized that the chief fiduciary value jeopardized is that of client *confidentiality*. ■ Thus, where a former client seeks to have a previous attorney disqualified from serving as counsel to a successive client in litigation adverse to the interests of the first client, the governing test requires that the client demonstrate a *"substantial relationship"* between the subjects of the antecedent and current representations.

The "substantial relationship" test mediates between two interests that are in tension in such a context—the freedom of the subsequent client to counsel of choice, on the one hand, and the interest of the former client in ensuring the permanent confidentiality of matters disclosed to the attorney in the course of the prior representation, on the other. Where the requisite substantial relationship between the subjects of the prior and the current representations can be demonstrated, access to confidential information by the attorney in the course of the first representation (relevant, by definition, to the second representation) is *presumed* and disqualification of the attorney's representation of the second client is mandatory; indeed, the disqualification extends vicariously to the entire firm. (See, e.g. *Rosenfeld Construction Co. v. Superior Court* (1991) 235 Cal.App.3d 566, 575 [286 Cal.Rptr. 609] [" 'If a substantial relationship is established, the discussion should ordinarily end. The rights and interest of the former client will prevail. Conflict would be presumed; disqualification will be ordered.' "]; *Henriksen* v. *Great American Savings & Loan* (1992) 11 Cal.App.4th 109, 117 [14 Cal.Rptr.2d 184] ["[W]here an attorney is disqualified because he formerly represented and therefore possesses confidential information regarding the adverse party in the current litigation, vicarious disqualification of the entire firm is compelled as a matter of law."]; *Galbraith* v. *State Bar* (1933) 218 Cal. 329, 332-333 [23 P.2d 291]; *In re Complex Asbestos Litigation* (1991) 232

the same or a substantially related matter . . . .) of the ABA's Model Rules of Professional Conduct (1989) and Disciplinary Rule 5-101 of the Model Code of Professional Responsibility (1980) ("Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of the client will be or reasonably may be affected by his own financial, business, property, or personal interests.") together with its related ethical considerations. (See also Rest., Law Governing Lawyers (Tent. Draft No. 4, 1991) §§ 209 [conflict as to current clients], 213 [conflict as to former client].)

Cal.App.3d 572 [283 Cal.Rptr. 732]; see generally, *T.C. & Theatre Corp.* v. *Warner Bros. Pictures* (S.D.N.Y. 1953) 113 F.Supp. 265, 268 [origin, interpreting canon 6 of the ABA Canons of Professional Ethics, of the substantial relationship formulation and the presumption that confidences relevant to the successive representation were disclosed if the relationship between the two is substantial].)

B

■ Both the interest implicated and the governing test are different, however, where an attorney's potentially conflicting representations are *simultaneous*. In such a situation—perhaps the classic case involving an attorney's interests in conflict with those of the client—the courts have discerned a distinctly separate professional value to be at risk by the attorney's adverse representations. The primary value at stake in cases of simultaneous or dual representation is the attorney's duty—and the client's legitimate expectation—of *loyalty*, rather than confidentiality. ■ And because the substantial relationship test is founded on the need to protect against the improper use of client *secrets*—a concern that often is not implicated by the simultaneous representation of clients in *unrelated* matters —and applies "where the representation of a former client has been terminated and the parameters of such relationship . . . fixed," such a test "does not set a sufficiently high standard by which the necessity for disqualification should be determined" in cases involving dual representation. (*Cinema 5, Ltd.* v. *Cinerama, Inc.* (2d Cir. 1976) 528 F.2d 1384, 1387.)

■ In evaluating conflict claims in dual representation cases, the courts have accordingly imposed a test that is more stringent than that of demonstrating a substantial relationship between the subject matter of successive representations.[3] Even though the simultaneous representations may have *nothing* in common, and there is *no* risk that confidences to which counsel is a party in the one case have any relation to the other matter, disqualification may nevertheless be *required*. Indeed, in all but a few instances, the rule of disqualification in simultaneous representation cases is a *per se* or "automatic" one. (See, e.g., *Cinema 5, Ltd* v. *Cinerama, Inc., supra*, 528 F.2d at p. 1387 ["Where the [attorney-client] relationship is a continuing one,

---

[3]The paradigmatic instance of such prohibited dual representation—one roundly condemned by courts and commentators alike—occurs where the attorney represents clients whose interests are *directly* adverse *in the same litigation*. So patently improper is the spectacle of this sort of conflict that George Sharswood, a justice of the Supreme Court of Pennsylvania and a 19th century writer on legal ethics, wrote in 1854 that it " 'ought, like parricide in the Athenian law, to be passed over in silence in a code of professional ethics.' " (*Developments in the Law—Conflicts of Interest in the Legal Profession* (1981) 94 Harv. L.Rev. at p. 1247.)

adverse representation is prima facie improper . . . ."]; *Truck Ins. Exchange v. Fireman's Fund Ins. Co.* (1992) 6 Cal.App.4th 1050, 1056-1059 [8 Cal.Rptr.2d 228] [discussing at p. 1057 whether "the automatic disqualification rule applicable to concurrent representation may be avoided by unilaterally converting a present client into a former client . . . ."]; *Kelly v. Greason* (1968) 23 N.Y.2d 368 [296 N.Y.S.2d 937, 943, 244 N.E.2d 456] ["[W]ith rare and conditional exceptions, the lawyer may not place himself in a position where a conflicting interest may, even inadvertently, affect, or give the appearance of affecting, the obligations of the professional relationship . . . ."]; *Developments in the Law—Conflicts of Interest in the Legal Profession, supra,* 94 Harv. L.Rev. at pp. 1296-1302 & accompanying fns.; cf. Rest., Law Governing Lawyers (Tent. Draft No. 4, *supra*) § 209, subd. (2).)

The reason for such a rule is evident, even (or perhaps especially) to the nonattorney. A client who learns that his or her lawyer is also representing a litigation adversary, even with respect to a matter *wholly unrelated* to the one for which counsel was retained, cannot long be expected to sustain the level of confidence and trust in counsel that is one of the foundations of the professional relationship. All legal technicalities aside, few if any clients would be willing to suffer the prospect of their attorney continuing to represent them under such circumstances. As one commentator on modern legal ethics has put it: "Something seems radically out of place if a lawyer sues one of the lawyer's own present clients in behalf of another client. Even if the representations have nothing to do with each other, so that no confidential information is apparently jeopardized, the client who is sued can obviously claim that the lawyer's *sense of loyalty* is askew." (Wolfram, Modern Legal Ethics (1986 ed.) § 7.3.2, p. 350, italics added.) It is for that reason, and not out of concerns rooted in the obligation of client confidentiality, that courts and ethical codes alike prohibit an attorney from simultaneously representing two client adversaries, even where the substance of the representations are unrelated.[4]

---

[4]There are, of course, exceptions even to this rule. The principle of loyalty is for the *client's* benefit; most courts thus permit an attorney to continue the simultaneous representation of clients whose interests are adverse as to unrelated matters provided full disclosure is made and both agree in writing to waive the conflict. (See, e.g., Steinberg & Sharpe, *Attorney Conflicts of Interest: The Need for a Coherent Framework* (1990) 66 Notre Dame L.Rev. 1, 3, fn. 7, and materials cited.) But this class of cases is a rare circumstance, typically involving corporate clients, and overcoming the presumption of "prima facie impropriety" is not easily accomplished. (See, e.g., *Cinema 5, Ltd. v. Cinerama, Inc, supra,* 528 F.2d at p. 1387; *United States v. Nabisco* (E.D.N.Y. 1987) 117 F.R.D. 40, 44; Rest., Law Governing Lawyers (Tent. Draft No. 4, *supra*) § 213, p. 160 (reporter's note to com. *e*). It is not, in any event, one that concerns us in this case, given Flatt's understandable decision not to represent Daniel in his

## C

The mandatory rule of disqualification in cases of dual representations involving unrelated matters—analogous to the biblical injunction against "serving two masters" (Matthew 6:24)—is such a self-evident one that there are few published appellate decisions elaborating on it. There are, however, a handful of opinions that leave no doubt as to the rule and its operation. In one of the earliest of the modern cases, *Grievance Committee* v. *Rottner* (1964) 152 Conn. 59 [203 A.2d 82], a law firm was retained by one Twible to represent him as a plaintiff in a collection matter. Although the firm neither charged the client a fee nor took a retainer (Twible failed to sign some necessary papers), it did file proceedings against the debtor on his behalf. While that suit was pending, another partner in the same firm agreed to file suit against Twible and to attach his house on behalf of a new client in a wholly unrelated matter.

When disciplinary proceedings were commenced against the attorneys and their firm on Twible's complaint, they defended on the ground that the two suits had "nothing in common" and thus did not create a conflict of interest. Concluding that "a firm may not accept any action against a person whom they are presently representing even though there is no relationship between the two cases," the Connecticut Supreme Court held that the attorneys had violated an ethical obligation *even if* there was no conflict: "When a client engages the services of a lawyer in a given piece of business he is entitled to feel that, until that business is finally disposed of in some manner, he has the undivided loyalty of the one upon whom he looks as his advocate and his champion. If, as in this case, he is sued and his home attached by his own attorney, who is representing him in another matter, all feeling of loyalty is necessarily destroyed . . . ." (203 A.2d at p. 84.)

In *Cinema 5, Ltd* v. *Cinerama, Inc., supra,* 528 F.2d 1384, an attorney was a partner in two firms, one in Buffalo, the other in New York City. While the Buffalo firm was representing client A as a defendant in an antitrust action in the Western District of New York, the New York City firm had filed suit against the same client A in the Southern District of New York alleging a conspiracy involving the client in an unlawful takeover attempt. When the defendants in the New York City action moved to have the firm disqualified from representing the plaintiffs in that proceeding, the firm defended on the ground that there was no substantial relationship between the two cases and thus no grounds for its disqualification.

The Second Circuit rejected application of the substantial relationship test under these circumstances. Here, the court wrote, "suit is not against a

contemplated lawsuit against Hinkle and his firm. There was thus no occasion here for disclosure and client waiver of the conflict.

*former* client, but an *existing* one. One firm in which [the attorney] is a partner is suing an actively represented client of another firm in which [the attorney] is a partner. The propriety of this conduct must be measured not so much against the similarities in litigation, as against the duty of *undivided loyalty* which an attorney owes to each of his clients." (528 F.2d at p. 1386, italics added.) The court further held that when client A retained a member of the Buffalo firm to defend its interests in the Western District litigation, "it was entitled to feel that at least until that litigation was at an end, it had his undivided loyalty as its advocate and champion [citation] and could rely upon his 'undivided allegiance and faithful, devoted service.'" (*Ibid.*; see also *Unified Sewerage Agency, etc.* v. *Jelco Inc.* (9th Cir. 1981) 646 F.2d 1339, 1345 [same rationale]; *International Business Machines Corp.* v. *Levin* (3d Cir. 1978) 579 F.2d 271, 280 [". . . [A] possible effect on the quality of the attorney's services on behalf of the client being sued may be a diminution in the vigor of his representation of the client in the other matter."]; cf. *Williams* v. *Reed* (C.C.D.Me. 1824) 29 Fed. Cas. 1386, 1390 (No. 17,733) (Story, J.) ["When a client employs an attorney he has a right to presume, if the latter be silent on the point, that he has no engagements, which interfere, in any degree, with his exclusive devotion to the cause confided to him; that he has no interest, which may betray his judgment, or endanger his fidelity."].)

### D

In California as well, our Court of Appeal, relying on some of the precedents discussed above, has reasoned that "[a] lay client is likely to doubt the loyalty of a lawyer who undertakes to oppose him in an unrelated matter. Hence the decisions condemn acceptance of employment adverse to a client even though the employment is unrelated to the existing representation." (*Jeffry* v. *Pounds* (1977) 67 Cal.App.3d 6, 11 [136 Cal.Rptr. 373].) *Jeffry* v. *Pounds* arose as a suit for attorney fees brought by a lawyer who had represented Pounds in personal injury litigation following an automobile accident. While the personal injury case was pending, another partner in the same firm was retained by Pounds's wife to draw up papers in her divorce proceeding against her husband. When Pounds learned of this adverse representation, he instructed another lawyer to take over the personal injury matter. Following the settlement of the personal injury litigation, Pounds's original attorney—now representing his wife in the divorce proceeding—sought a share of the settlement proceeds as a fee.

Relying on then section 4-101 of our Rules of Professional Conduct, the trial court ruled in favor of the attorney—rejecting Pounds's claim that no fee was due because the lawyer had accepted employment hostile to his

interests by representing his wife—on the ground that no confidential financial information had passed to the attorneys which might have aided them in the divorce case. (67 Cal.App.3d. at pp. 8-9.) Reversing the judgment of the trial court, the Court of Appeal observed that "rule 4-101 [is] aimed to protect the confidential relationship between attorney and client. [Citations.] The strictures against dual representation of antagonistic interests are far broader; they arise without potential breaches of confidentiality. In California, these strictures are codified in rule 5-102 of the Rules of Professional Conduct. . . . [¶] The question here is whether a lawyer or law firm breaches rule 5-102(B), when, without the knowledge and consent of the current client, it undertakes to represent a third person in suing that client on an unrelated matter. We answer the question in the affirmative." (*Id.* at pp. 9-10, fn. omitted.)[5]

■ So inviolate is the duty of loyalty to an existing client that not even by withdrawing from the relationship can an attorney evade it. Thus, in *Truck Ins. Exchange* v. *Fireman's Fund Ins. Co., supra*, 6 Cal.App.4th 1050, the Court of Appeal discussed the aptly named "hot potato rule," that is, the bar on curing dual representation conflicts by the expedient of severing the relationship with the preexisting client. There, in a subrogation action by several insureds and their insurers against another carrier, a law firm representing plaintiff insurer A sought to avoid disqualification by withdrawing from a concurrent representation of a subsidiary of defendant insurer B in unrelated litigation. The court held that " '[t]he principle precluding representing an interest adverse to those of a current client is based not on any concern with the confidential relations between attorney and client but rather on the need to assure the attorney's undivided loyalty and commitment to the client. [Citations].' " (*Id.* at p. 1056.) The court went on to hold that the "automatic disqualification rule applicable to concurrent representation [cannot] be avoided by unilaterally converting a present client into a former client prior to hearing on the motion for disqualification[.]" (*Id.* at p. 1057; see also *Civil Service Com.* v. *Superior Court* (1984) 163 Cal.App.3d 70, 78, fn. 1 [209 Cal.Rptr. 159] [". . . an attorney may simply not undertake to represent an interest adverse to those of a current client without the client's approval. [Citations.]."])

The reasoning of these cases, especially that of the Court of Appeal in *Jeffry* v. *Pounds,* 67 Cal.App.3d 6, evokes the original framework for

[5]Former rule 5-102 (as well as former rule 4-101 [requiring attorneys to preserve the confidentiality of client matters]) became part of current rule 3-310 following this court's adoption of the revised Rules of Professional Conduct of the State Bar of California on November 28, 1988. The former rules governing attorneys' duties of confidentiality and loyalty were thus consolidated into a single rule.

assessing an attorney's duty of loyalty laid down by this court almost 65 years ago in *Anderson* v. *Eaton* (1930) 211 Cal. 113 [293 P. 788]. In that case, involving an attorney's dual representation of the plaintiffs in a wrongful death action on behalf of their son's estate and of the insurance company representing the son's employer in worker's compensation proceedings, we had this to say regarding the attorney's duty of loyalty to the client: "One of the principal obligations which bind an attorney is that of fidelity, the maintaining inviolate the confidence reposed in him by those who employ him, and at every peril to himself to preserve the secrets of his client. [Citations.] This obligation is a very high and stringent one. It is also an attorney's duty to protect his client in every possible way, and it is a violation of that duty for him to assume a position adverse or antagonistic to his client without the latter's free and intelligent consent given after full knowledge of all the facts and circumstances. [Citation.] *By virtue of this rule an attorney is precluded from assuming any relation which would prevent him from devoting his entire energies to his client's interests.* Nor does it matter that the intention and motives of the attorney are honest. The rule is designed not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties, or be led to attempt to reconcile conflicting interests, rather than to enforce to their full extent the rights of the interest which he should alone represent." (*Id.* at p. 116, italics added.)

The sentiment expressed by this court in *Anderson* v. *Eaton,* 211 Cal. 113, encapsulates precisely the principle of loyalty that ought to govern the resolution of this case. For if the duty of loyalty to the client forbids any act that would interfere with the dedication of an attorney's "entire energies to [the] client's interests," (*id.* at p. 116) then a fortiori it ought to follow that Flatt had no duty to give Daniel advice that would, incrementally at least, have aided in advancing his contemplated lawsuit against Hinkle, the firm's existing client. The situation confronting Flatt on learning of the client's conflicting interests following the July 27 meeting was, after all, a form of zero sum game in which, given the adverse posture between Daniel and Hinkle, Flatt was caught ineluctably in the middle: any benefit to Daniel of Flatt's legal advice regarding his contemplated damage action would adversely affect the interests of Hinkle, already the firm's client and the target of the purported lawsuit. In such a situation, ". . . one's loss translates . . . into another's gain [and] the fiduciary will almost certainly be unable to avoid a breach of his duty to promote the interests of each with loyal vigor." (*Developments in the Law—Conflicts of Interests in the Legal Profession, supra,* 94 Harv. L.Rev. 1244, 1295-1296 [discussing simultaneous representation of adverse interests in the *same* matter].)

Flatt's decision not to represent Daniel in light of her firm's ongoing representation of the Hinkle firm thus placed her in an ethical dilemma: on severing—as she must—the relationship with Daniel, what if any duty did she have to advise him respecting his contemplated lawsuit, advice that would almost inevitably harm Hinkle's interests to some extent? We have no difficulty in concluding that under these circumstances any advice to Daniel regarding the statute of limitations governing his claim against Hinkle would have run counter to the interests of an existing client of Flatt and her firm and of their obligation of undivided loyalty to him. We therefore conclude that she had no *duty* to give Daniel any such advice.[6]

Not only would the advisory duty argued for by Daniel have been contrary to the principle of attorney loyalty, it would as a practical matter have placed both Hinkle and Flatt in an insupportably awkward position, one that was bound to damage Hinkle's relationship with the firm and hobble the firm's effectiveness in representing him. It is not difficult to imagine Hinkle's reaction on learning that, in the course of severing her professional relationship, however infant, with Daniel, Flatt had advised Hinkle's would-be adversary of the statute of limitations governing the timing of his lawsuit and that, Flatt having refused to take his case, it was prudent to seek alternative counsel lest Daniel's claim against Hinkle be barred by the passage of time.

Under such circumstances, we think any client—even an attorney such as Hinkle—would be entitled to wonder whether the law's sense of casuistry had gone seriously wrong. As noted, *ante*, at pages 284-285, several courts have mentioned these very practical effects on client morale and trust presented by the spectacle of an attorney simultaneously representing adverse parties, even as to matters that are unrelated. (See, e.g., *Grievance Committee* v. *Rottner, supra*, 203 A.2d at p. 84; *Cinema 5, Ltd.* v. *Cinerama, Inc., supra*, 528 F.2d at p. 1386; *International Business Machines Corp.* v. *Levin, supra*, 579 F.2d at p. 280 ["A serious effect on the attorney-client relationship may follow if the client discovers from a source other than the attorney that he is being sued in a different matter by the attorney. The fact that a deleterious result cannot be identified subsequently as having actually occurred does not refute the existence of a likelihood of its occurrence . . . ."]; *Jeffry* v. *Pounds,* 67 Cal.App.3d at p. 11; cf. Fried, *The Lawyer as Friend: The Moral Foundations of the Lawyer-Client Relation* (1976) 85 Yale

---

[6]We acknowledge, without having to decide in this case, the possibility that in a different factual situation—one involving, perhaps, the lapse of considerable time and the expenditure of substantial resources before discovery of the conflicting dual representation—an attorney's mere withdrawal from the second representation may not be sufficient in itself to resolve all ethical responsibilities. Whether a showing, for example, of substantial prejudice to the interests of the second client arising out of such facts would lead us to modify the rule we adopt in this case is a question whose answer must await another day.

L. J. 1060, 1067 [portraying the attorney's relationship to the client as that of "one [who] has a special care for the interests of those accepted as clients, just as his friends, his family, and he himself have a very general claim to his special concern."].)

E

Neither, we conclude, did Flatt have a duty under the circumstances to advise Daniel that it was prudent to seek other counsel promptly. Having sought an attorney to plead his case against Hinkle and having been turned down by Flatt, Daniel obviously knew that he had to continue the search for representation if he intended to pursue the claim. He admitted as much at his deposition. (See, *ante*, fn. 1, at p. 282.) Although, as Justice Phelan pointed out in his dissent from the majority Court of Appeal opinion, it is prudent for any attorney not facing a conflict in representation like that here to routinely advise a client or potential client not to delay in finding alternative representation (see, e.g., Mallen & Smith, Legal Malpractice (3d ed. 1989) § 2.11, at pp. 114-115), we cannot hold Flatt liable for not having done so. Not only is the average client's understanding of the practical realities of obtaining representation to defend or vindicate interests adequate to protect against the risks at stake, but the insoluble ethical dilemma raised by imposing on a fiduciary a duty to provide advice that is against the interests of an existing client argues conclusively against a contrary holding.

CONCLUSION

Using an optical metaphor, the dissent twice describes the majority opinion as "myopic." We agree that the utility of a judicial opinion often lies in its choice of focal point. While one ponders the outline of a single tree, another may discern, across a boundless forest, the path of the law. We choose to take the latter road. The judgment of the Court of Appeal is reversed and the cause is remanded with directions to order that defendants' motion for summary judgment be granted.

Lucas, C. J., Baxter, J., and George, J., concurred.

**KENNARD, J., Dissenting.**—After learning that she would be unable to continue representing a client because her law firm also represented the person whom the client intended to sue, a lawyer withdrew from representation without advising the client of the time within which the client had to file suit to avoid the bar of the statute of limitations. The client has now sued the lawyer, alleging that the lawyer committed professional malpractice by failing to advise the client of the statute of limitations.

The majority immunizes the lawyer from any possible liability for malpractice. It does so by dividing clients into two classes and holding that lawyers may injure a second-class client with impunity so long as they do so to advance the interest of a first-class client. The majority's division of clients into different classes and its authorization of lawyers injuring one client for the benefit of another is unprecedented, and it sends the message that any client who trusts a lawyer to act in accordance with his or her professional duties, or who expects that a lawyer who fails to do so will answer in damages, may be foolishly mistaken.

A lawyer who has conflicting responsibilities to two different clients is caught in a dilemma, because steps taken to protect the rights of one client may cause injury to the other. But the fact that the dilemma arose is surely not the fault of the *clients*. A lawyer assumes a duty of care to each client whom the lawyer agrees to represent; if the lawyer negligently breaches that duty, he or she should be liable to the client for any damage to the client caused by the breach. Because I cannot agree that a lawyer who negligently injures one client can escape liability simply by showing that the injuries advanced the interest of another client, I dissent.

I

This case comes to us on the trial court's denial, upheld by the Court of Appeal, of summary judgment sought by Attorney Gail Flatt and her law firm, the defendants in this case. For purposes of the summary judgment motion (see *Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46]), we assume the following facts to be true.

William Daniel engaged Attorney Flatt to file an action against Donald Hinkle.[1] When Flatt later learned that her law firm already represented Hinkle in an unrelated matter,[2] she concluded that her firm's simultaneous representation of both Hinkle and Daniel created a conflict of interest, and she withdrew from her representation of Daniel. When she did so, she failed to advise Daniel regarding the running of the limitations period on his claim

---

[1] It is a disputed issue whether or not Daniel was Flatt's client. As the majority notes, because we are reviewing the trial court's denial of Flatt's motion for summary judgment, we may not resolve that disputed issue but must instead assume for purposes of our decision that Daniel was Flatt's client.

[2] Although I assume, for purposes of this opinion, that Flatt's firm continued to represent Hinkle, it is unclear whether Hinkle remained a client of Flatt's firm when Flatt began representing Daniel. The only evidence in the record as to the period of Flatt's law firm's representation of Hinkle shows that its representation of Hinkle ended one month before Flatt's representation of Daniel began. If Hinkle was only a former client of Flatt's, then there was no conflict of interest between the two representations because their subject matter was not substantially related, and Flatt had no need to withdraw from her representation of Daniel.

against Hinkle and failed to advise him that he should promptly seek new counsel to pursue his claim. By the time Daniel filed suit against Hinkle, the applicable statute of limitations had apparently expired. Anticipating a dismissal of his lawsuit on this ground, Daniel also sued Flatt and her law firm (hereafter collectively referred to as Flatt) for malpractice. Daniel asserted that, in not warning him to promptly retain new counsel and promptly file his action to avoid the bar of the statute of limitations, Flatt breached the duty of care she owed him.

## II

The majority reaches the wrong result in this case because it mischaracterizes the issue before us. As posed by the majority, the issue is whether Attorney Flatt's duty of loyalty to Hinkle can negate her "duty . . . to inform [Daniel] of the statute of limitations applicable to [Daniel's] proposed lawsuit or even of the advisability of seeking alternative counsel." (Maj. opn., *ante*, at pp. 278-279.) As I shall explain, by describing the issue in this fashion, the majority inaccurately depicts the duty that Flatt owed to her client, Daniel, and conflates two closely related but analytically distinct questions: whether Flatt owed a duty to Daniel, and if so, whether that duty required Flatt to advise Daniel of the statute of limitations and the necessity of retaining new counsel.

In this case, Daniel alleges that Attorney Flatt engaged in professional malpractice. The elements of a cause of action for professional malpractice, which include the duty that the professional owes to the client, are well established. They are: "(1) *the duty of the professional to use such skill, prudence, and diligence as other members of his [or her] profession commonly possess and exercise;* (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence. [Citations.]" (*Budd* v. *Nixen* (1971) 6 Cal.3d 195, 200 [98 Cal.Rptr. 849, 491 P.2d 433], italics added.) Thus, the duty owed by a professional is not a duty to perform any particular action (for instance, a lawyer advising a client of the applicable statute of limitations), but is simply a duty "to use such skill, prudence and diligence as other members of his [or her] profession commonly possess and exercise" (*ibid.*; see also *Flowers* v. *Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 998 [35 Cal.Rptr.2d 685, 884 P.2d 142]). Whether that standard of care obligates a professional to advise a client of a statute of limitations, or to perform any other specific action, is a factual question that will vary from case to case.

Therefore, when it states that in this case this court must determine whether Flatt owed a duty to advise Daniel regarding the statute of limitations on his lawsuit, the majority has misstated the issue. Flatt's duty, if it

existed, was a duty to use the skill, prudence, and diligence commonly possessed by other attorneys, not a duty to advise Daniel about the statute of limitations; but if Flatt did owe Daniel that duty of care, then Flatt's failure to advise Daniel of the statute of limitations may have been a breach of that duty. Thus, the two issues in this case are these: (1) whether Attorney Flatt owed a duty of care to Daniel; and (2) if so, whether that duty obligated Flatt to advise Daniel regarding the statute of limitations when Flatt withdrew from representation of Daniel. As discussed below, the majority's failure to separately address these two questions leads it to the wrong result.

## III

As I have pointed out, the first issue this court must resolve is whether Attorney Flatt owed Daniel a duty of care. It is unclear how the majority would answer this question, because the majority never squarely addresses it. In my view, once one assumes, as does the majority, that Daniel was Flatt's client, the conclusion is inescapable that Flatt owed a duty of care to Daniel.

An attorney who enters into an attorney-client relationship assumes a duty of care toward that client. As this court stated nearly 100 years ago: "The relation between attorney and client is a fiduciary relation of the very highest character, and binds the attorney to most conscientious fidelity . . . ." (*Cox v. Delmas* (1893) 99 Cal. 104, 123 [33 P. 836].) This is true even when the attorney has entered into a similar relationship with another client whose interests are adverse.

While acknowledging, for purposes of summary judgment, that Daniel was Attorney Flatt's client, the majority fails to recognize that the inevitable consequence of Daniel's status as a client is that Flatt owed Daniel the same duty of care that she owed Hinkle and every other client. Instead, the majority myopically focuses solely on Flatt's duty to Hinkle, and holds that her duty of loyalty to Hinkle "absolved her of a duty to provide *any* advice to Daniel adverse to the interests of Hinkle." (Maj. opn., *ante*, at p. 281.)[3]

If the only relevant duty governing Flatt's actions was her duty of loyalty to Hinkle, this would be a simple case: Flatt would be justified in doing all that she could to prevent Daniel from retaining new counsel and pursuing his litigation against Hinkle before the expiration of the applicable statute of limitations.

---

[3]Throughout its opinion, the majority describes the duty that Attorney Flatt owed to Hinkle as a "duty of loyalty." Left unexplained is the relationship between this duty of loyalty and the duty of care that forms the basis for evaluating an attorney's conduct in a case of professional malpractice.

Flatt's duties, however, were not one-sided, because both Daniel and Hinkle were her clients. Flatt owed each of her clients a duty of care; her duty to one did not abrogate her duty to another. (See *Ishmael* v. *Millington* (1966) 241 Cal.App.2d 520, 526 [50 Cal.Rptr. 592] [When a lawyer represents dual interests, "[t]he loyalty [the lawyer] owes one client cannot consume that owed to the other."].) To hold otherwise would turn the status of client into a meaningless label.

Even if, as the majority concludes, Flatt would have violated her duty of loyalty to her client Hinkle by giving advice to Daniel when she withdrew from representing him, that fact does not absolve her of her duty of care to Daniel and it does not exonerate her from liability if she has breached that duty. That Flatt may have been forced to choose between her responsibilities to two clients provides no justification for immunizing her from liability if she did not act with the skill, prudence, and diligence that other members of the profession would have exercised under the circumstances. Daniel did not create the conflict. He was deprived of the services of the counsel of his choice through no fault of his own. The majority has advanced no reason why he should bear the loss resulting from the attorney's resolution of the conflict.

The effect of the majority's decision is to create two classes of clients, and to hold that the duties owed to the first-engaged client (here, Hinkle) not only can negate the duties owed to the second-engaged client (here, Daniel) but can also immunize the lawyer from liability for injuring the second-engaged client to advance the interests of the first-engaged client. This result is unprecedented in the law. Contrary to the majority's view, neither the standards of professional conduct nor the body of tort law governing attorney malpractice recognize certain clients as more favored than others, nor do they authorize a lawyer to injure one client to advance the interests of another client.

## IV

As I observed earlier, by becoming Daniel's lawyer, Flatt assumed a duty of care to Daniel. I now consider the scope of that duty: under the facts of this case, was Flatt obligated to advise Daniel of the statute of limitations, or of the need to promptly retain new counsel to pursue his claim against Hinkle? As I shall discuss, this is a question of fact, which cannot be resolved on a motion for summary judgment.

Because of its "inherently situational" nature (see *Flowers* v. *Torrance Memorial Hospital Medical Center*, *supra*, 8 Cal.4th 992, 997), the determination whether the standard of care requires a lawyer to perform a particular

action in a particular case is ordinarily a question that should be resolved by a jury after a trial, not by a court on a motion for summary judgment. As this court has stated recently, application of the standard of care to the facts of a case "is a task for the trier of fact if reasonable minds might differ as to whether the defendant's conduct has conformed to the standard. [Citations.]" (*Ramirez* v. *Plough, Inc.* (1993) 6 Cal.4th 539, 546 [25 Cal.Rptr.2d 97, 863 P.2d 167].) In a case of professional malpractice, the standard of care against which the acts of the professional are to be measured generally requires expert testimony. (*Flowers* v. *Torrance Memorial Hospital Medical Center*, *supra*, 8 Cal.4th 992, 1001; *Lipscomb* v. *Krause* (1978) 87 Cal.App.3d 970, 975-976 [151 Cal.Rptr. 465]; *Lysick* v. *Walcom* (1968) 258 Cal.App.2d 136, 156 [65 Cal.Rptr. 406, 28 A.L.R.3d 368].)

Here, Daniel contends that Attorney Flatt breached her duty of care when, upon withdrawing from her representation of Daniel, she failed to advise him that the limitations period on his claim against Hinkle was running and that he should seek replacement counsel promptly. It is undisputed that Flatt did not give this advice. In order to grant summary judgment for Flatt on this ground, we would have to decide that no reasonable trier of fact could conclude that under these circumstances the duty of care Flatt owed to Daniel required her to warn Daniel about the statute of limitations. (See *Ishmael* v. *Millington*, *supra*, 241 Cal.App.2d at pp. 525-528; *Lysick* v. *Walcom*, *supra*, 258 Cal.App.2d at p. 150 ["Breach of duty is usually a fact issue for the jury, but it may be resolved as a matter of law if the circumstances do not permit a reasonable doubt as to whether the defendant's conduct violates the degree of care exacted of him."].) As I shall explain, a jury could reasonably conclude that Flatt's conduct toward Daniel violated the degree of care expected of her.

Because Flatt chose to resolve the conflict of interest between clients Daniel and Hinkle by withdrawing from her representation of Daniel,[4] her conduct was governed by the State Bar Rules of Professional Conduct, rule 3-700(A)(2), which requires that "[a] member shall not withdraw from

---

[4]Although the majority describes this as a case in which Flatt had "a mandatory and unwaivable duty *not* to represent [Daniel]" (Maj. opn., *ante*, at p. 279; see also maj. opn., *ante*, at pp. 282, 285-286), such is not the case. Flatt might well have been able to resolve the conflict of interest by withdrawing from her representation of Hinkle, rather than Daniel, so long as the conflict of interest arose inadvertently. (See *Truck Ins. Exchange* v. *Fireman's Fund Ins. Co.* (1992) 6 Cal.App.4th 1050, 1059-1060 [8 Cal.Rptr.2d 228].) Moreover, there was another option available to Flatt: our Rules of Professional Conduct permit a lawyer to "[r]epresent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter" if both clients give their informed written consent to the dual representation. (Rules Prof. Conduct, rule 3-310(C)(3).) The record does not show why Flatt did not pursue either of these options.

employment until the member has taken reasonable steps to avoid reasonably foreseeable prejudice to the rights of the client . . . ." Oddly, the majority does not discuss this rule.

Depending on the circumstances, a lawyer's obligation to take "reasonable steps to avoid reasonably foreseeable prejudice" upon withdrawing from representation of a client can require the lawyer to advise the client of the running of the applicable statute of limitations on the client's claim or of the need to promptly seek replacement counsel. (See *Miller* v. *Metzinger* (1979) 91 Cal.App.3d 31, 42 [154 Cal.Rptr. 22] [lawyer withdrawing from a representation was required under the circumstances to advise client that limitations period was running and that client should promptly seek replacement counsel].)

Whether, on the facts of this case, Attorney Flatt breached her duty of care to Daniel by failing to advise him upon withdrawing from representation that the limitations period was running or that he should promptly seek replacement counsel is an issue to be resolved by expert evidence regarding the standard of care. (See *Flowers* v. *Torrance Memorial Hospital, supra,* 8 Cal.4th at p. 1001; *Lipscomb* v. *Krause, supra,* 87 Cal.App.3d at pp. 975-976; *Lysick* v. *Walcom, supra,* 258 Cal.App.2d at p. 156.) This issue could be resolved on summary judgment only if, by offering uncontroverted expert evidence, Flatt established that the reasonably prudent lawyer, withdrawing from representation of Daniel under these circumstances, would not have advised Daniel of the running of the statute of limitations or of the need to promptly obtain other counsel.

Here, the record contains no such evidence. The only ground on which Flatt sought summary judgment was that Daniel was never her client and that therefore she never owed him any duty whatsoever. Flatt never argued she was entitled to summary judgment on the ground that even if Daniel was a client, she had no duty to advise him of the statute of limitations applicable to his claim, or of the immediate need to employ new counsel. The only evidence Flatt submitted in support of her summary judgment motion attempted to show that no attorney-client relationship ever arose between her and Daniel, a theory on which, the majority concedes, she was not entitled to summary judgment. (Maj. opn., *ante,* at p. 281.) Neither party submitted any evidence, expert or otherwise, as to the standard of care that a reasonably prudent lawyer would have used in withdrawing from the representation of a client because of a conflict of interest arising from concurrent but unrelated representations.

Because the record contains no evidence showing what the standard of care would have required Flatt to do upon discovering the conflict of interest

and withdrawing from her representation of Daniel, Flatt has failed to establish, as a matter of law, that her duty of care to Daniel did not obligate her to advise him regarding the statute of limitations. Therefore, Flatt has not demonstrated that her actions satisfied the standard of care she owed to Daniel, and Flatt is not entitled to summary judgment on this ground. (See *Hunsucker* v. *Sunnyvale Hilton Inn* (1994) 23 Cal.App.4th 1498, 1501 [28 Cal.Rptr.2d 722]; *Bro* v. *Glaser* (1994) 22 Cal.App.4th 1398, 1405 [27 Cal.Rptr.2d 894].)

I recognize that unexpected conflicts of interest may arise in the midst of litigation, and that, through no fault of their own, attorneys may find themselves representing clients with adverse interests. Although our Rules of Professional Conduct admonish attorneys to avoid conflicts of interest, they provide little guidance in advising attorneys how to disentangle themselves once a conflict has arisen. These rules do require, however, that an attorney presented with a conflict of interest must take reasonable steps to ensure that any client who must seek new counsel because of the conflict is able to do so without injury. (See Rules Prof. Conduct, rule 3-700(A)(2).) Such steps are therefore necessary if an attorney is to act with the professional skill, prudence, and diligence required by our tort law.

## V

In this case, the majority immunizes Attorney Flatt from liability by myopically focusing solely on Flatt's duty to her client Hinkle, and concluding that her duty to Hinkle absolved her of any duty to her other client, Daniel. A lawyer, however, owes a duty of care to every client, and should not be permitted to escape liability for breaching the duty owed to one client by showing that the lawyer thereby advanced the interests of another client. Flatt's duty to Hinkle did not, as a matter of law, negate the duty she owed Daniel. Nor, as discussed above, has Flatt shown that her duty to Daniel did not require her, under the facts of this case, to advise Daniel regarding the applicable statute of limitations. Because the record does not conclusively show either that Flatt owed no duty to Daniel, or that she did not breach the duty of care that she allegedly owed him, the trial court properly denied Flatt's motion for summary judgment. I would therefore affirm the judgment of the Court of Appeal denying Flatt's petition for a writ of mandate.

Denying summary judgment to Flatt on these grounds would not mean that Daniel would necessarily prevail ultimately in his malpractice action against Flatt. Far from it. Daniel would still have to prove, for example, that an attorney-client relationship arose between him and Flatt as a result of their single meeting (see, e.g., *Miller* v. *Metzinger*, *supra*, 91 Cal.App.3d at

pp. 39-40), that the standard of care applicable to Flatt would have required her to advise him upon her withdrawal as his counsel that the applicable statute of limitations was running and that he needed to obtain new counsel promptly (see *id.* at p. 42), that her failure to do so caused him to lose his underlying action against Hinkle (see, e.g., *Thomas* v. *Lusk* (1994) 27 Cal.App.4th 1709, 1716 [34 Cal.Rptr.2d 265]), and that he would have prevailed in his underlying action against Hinkle (see *ibid.*).

All of these are obstacles on which Daniel's case against Flatt could properly founder. I cannot agree with the majority, however, that the reason Daniel should lose is that he belongs to a new species of client to whom lawyers owe no duty.

Mosk, J., and Werdegar, J., concurred.

The petition of real party in interest for a rehearing was denied March 2, 1995. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.