Filed 1/15/21 (unmodified opn. attached)

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Mono)

----

| | |
|---|---|
| LUCILLE CAPRA et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> THOMAS CAPRA, <br><br> Defendant and Appellant. | C084032 <br><br> (Super. Ct. Nos. CV160037, BC609538) <br><br> ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed on December 22, 2020, be modified as follows:

1. On page 9, in the paragraph beginning "Probate proceedings are proceedings in rem," the words "The probate department of" in the paragraph's second sentence are deleted. The sentence is to read:

A superior court has jurisdiction to determine the interests of all parties connected with the property of a decedent based on the property's location within the state.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Part III of the Discussion.

1

2.　　On pages 9-10, in the paragraph beginning "In addition to the rules," the words "the probate department of" in the paragraph's first sentence are deleted, and in the same sentence the words "sitting in probate" are added after "a superior court."　In the next sentence, the word "department" is replaced with "court".　In the third sentence of this same paragraph, the word "department" is replaced with "court."　The modified paragraph is to read in its entirety as follows:

> In addition to the rules of fundamental and in rem jurisdiction, state statutes declare that a superior court sitting in probate has "exclusive jurisdiction" over certain types of actions.　For example, the probate court has exclusive jurisdiction to probate and interpret a will, determine entitlement to distribution, and administer and distribute a decedent's estate.　(Prob. Code, §§ 8200-8272, 21120-21122, 11700-11705, 9600 et seq., 11600 et seq.)　The probate court also has exclusive jurisdiction over proceedings concerning the "internal affairs" of inter vivos trusts, even if the trust property is administered outside of probate.　(Prob. Code, § 17000, subd. (a).)

3.　　On page 10, in the paragraph that starts with "Use of the term," in the third sentence that starts with "Rather, it concerns" the words "the department of the superior court assigned to hear probate matters" are added after "certain actions to," and the words "a superior court's probate department" are deleted.　In this same paragraph, following the *Estate of Bowles* citation, a quote is added in brackets to read:　["[T]he superior court is divided into departments, including the probate department, as a matter of convenience; but the subject matter jurisdiction of the superior court is vested as a whole. . . .　[¶]　[B]y statute, the probate department has exclusive jurisdiction of the . . . section 17200 petition . . . ."].　The modified paragraph is to read in its entirety as follows:

Use of the term "exclusive jurisdiction" in these contexts is somewhat misleading. The term does not refer to jurisdiction in the "fundamental," "in personam" or "in rem" sense. Rather, it concerns assigning exclusive responsibility over certain actions to the department of the superior court assigned to hear probate matters as against other departments *in that same county superior court*, such as the departments that hear civil matters. "Exclusive jurisdiction" in the Probate Code does not distinguish between different county superior courts. (See *Estate of Bowles* (2008) 169 Cal.App.4th 684, 695-696 ["[T]he superior court is divided into departments, including the probate department, as a matter of convenience; but the subject matter jurisdiction of the superior court is vested as a whole. . . . [¶] [B]y statute, the probate department has exclusive jurisdiction of the . . . section 17200 petition . . . ."] ; *Harnedy v. Whitty, supra*, 110 Cal.App.4th at pp. 1344-1345.)

There is no change in the judgment.

BY THE COURT:

_____
BLEASE, Acting P. J.

_____
HULL, J.

_____
DUARTE, J.

3

Filed 12/22/20 (unmodified version)
<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Mono)

----

| | |
|---|---|
| LUCILLE CAPRA et al., | C084032 |
| Plaintiffs and Appellants, | (Super. Ct. Nos. CV160037, BC609538) |
| v. | |
| THOMAS CAPRA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Mono County, Mark G. Magit, Judge. Reversed in part and affirmed in part.

Parker Ibrahim & Berg, Kathleen Mary Kushi Carter and Heather P. Karl for Plaintiffs and Appellants.

Law Offices of Emanuel Barling, Jr., and Emanuel Barling, Jr., for Defendant and Appellant.

_____

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Part III of the Discussion.

1

In this action, heirs contest rights to a family cabin and a federal use permit authorizing the cabin on federal land.  Plaintiffs allege the defendant is wrongfully claiming sole ownership of the cabin and permit and is threatening to sell the property.  Three actions taken by the trial court are the subject of this appeal:  (1) the court sustained the defendant's demurrer without prejudice and dismissed the action solely based on lack of jurisdiction; (2) it denied plaintiffs' motion to disqualify defendant's attorney; and (3) it denied plaintiffs' application for injunctive relief filed while this appeal was pending.  Plaintiffs contend the trial court erred in each instance.  In his cross-appeal, defendant contends the trial court erred by not dismissing the action with prejudice.

We reverse in part and affirm in part, and we remand for further proceedings.  We hold (1) the trial court had jurisdiction to try this matter; (2) the court did not abuse its discretion when it denied plaintiffs' motion to disqualify counsel; and (3) plaintiffs' application for injunctive relief pending this appeal is now moot.  An application for injunctive relief and defendant's arguments for dismissing with prejudice may be considered by the trial court on remand.

FACTS AND PROCEDURAL HISTORY

A. *Factual Background*

"On demurrer review, we accept the truth of material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law.  We may also consider matters subject to judicial notice." (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 346.)

In 1948, Frank R. Capra (Frank Sr.) and his wife Lucille (Lucille Sr.) acquired a house built on federal land in June Lake, Mono County.  (We refer to the Capra parties and relatives by their first names to avoid confusion.)  The parties refer to the house as "the cabin."  Frank Sr. and his wife also obtained a use permit from the United States

2

Forest Service to use the land for a recreational residence. They used the cabin as a summer home for themselves and their children. Later, their grandchildren and great-grandchildren also enjoyed spending summers at the cabin. The use permit was renewable every 20 years.

In 1974, Frank Sr. and Lucille Sr. organized the Capra Family Trust. The trust property consisted of the sum of $100 and any other property which by inter vivos transfer or will would be conveyed to the trust.

Lucille Sr. died in 1984, and ownership of the cabin and the permit passed to Frank Sr. After his wife's death, Frank Sr. confirmed the trust and named his children, Frank Capra Jr. (Frank Jr.), plaintiff Lucille Capra (Lucille), and defendant Thomas Capra (Thomas) as successor trustees of the trust. He also amended the trust declaration to state that upon his death, the residue of his share of the trust "shall be distributed to his children, Frank Capra, Jr., Lucille [Capra] and Thomas Capra, in equal shares . . . ." Prior to this amendment, the trust declaration had stated that upon Frank Sr.'s death, the residue of his share of the trust was to be divided into three equal shares "which shall constitute separate trusts" for each of the Capras' three children, and the shares were "to be held in trust" for each beneficiary's lifetime. The amended declaration omitted reference to the residual property being held in trust for the three children.

Frank Sr. died in 1991. Probate of his estate began that year in the Riverside County Superior Court, Indio Branch, sitting in probate.

Frank Sr. had owned all the shares of Frank Capra Productions, Inc. (FCP). After his death, his shares were distributed in equal parts to Frank Jr., Lucille, and Thomas. Thomas has been the president of FCP since 1993.

In 1992, Frank Jr. and Thomas attempted to transfer the Forest Service permit to themselves and Lucille as trustees of the trust, but the Forest Service would not allow three names to be on the permit. The Forest Service would allow only an individual or a married couple to be named on the permit.

3

The three siblings decided it made sense for Thomas to be the trustee listed on the permit because Lucille was not living in California. Plaintiffs allege that Lucille and Frank Jr. "agreed to forego their rights to act as the representative on the Permit and allowed Thomas to be the representative Trustee named on the Permit." In October 1992, the Forest Service placed Thomas's name on the permit. The permit was renewed in 2008 in Thomas's name.

On May 26, 1993, the Riverside County probate court settled Frank Sr.'s estate and ordered final distribution. Pursuant to Frank Sr.'s will, the court ordered that all of Frank Sr.'s residual property be transferred to Frank Jr., Lucille, and Thomas as trustees of the Capra Family Trust. This property included the cabin and the permit. (The probate court misidentified the trust as the "Frank R. Capra and Lucille R. Capra Trust dated December 14, 1981." The correct name is "The Capra Family Trust," dated November 25, 1974 and later amended, among other times, on December 14, 1981.)

Frank Sr.'s children and grandchildren continued to spend time at the cabin after Frank Sr.'s death. FCP paid for the cabin's maintenance, including property taxes, Forest Service bills, utilities, phone and cable bills, insurance, furnishings, landscaping, repairs, and cleaning.

In 2001, Lucille transferred her interests in the cabin and the permit to her personal trust. Frank Jr. died in 2007 intestate in North Carolina. His estate passed to his wife and his three children, two of whom are plaintiffs in this action: Frank III and Jonathan.

In 2011, Thomas told Lucille that FCP was no longer generating enough income to pay all the cabin's costs. He asked Lucille to begin contributing money to help defray the expenses. Once that year, he asked her to send $2,400 to FCP's accountant to help cover the costs. Thomas and his wife, defendant Kris, occasionally paid for the expenses with their personal funds and were reimbursed by FCP.

At some point, Thomas established a bank account with Bank of America to use for paying the cabin's expenses. He referred to the account as the "lake house account" or "lake account." He also told Lucille that he had left $50,000 in a trust to fund the cabin's expenses until all of Frank Sr.'s grandchildren could decide what they wanted to do with the cabin.

In 2012, Thomas continued to represent to Lucille that the cabin belonged to the entire family. That year, he asked Lucille, Jonathan, and Frank III to deposit money into the Bank of America account to fund the cabin. He and Lucille, as officers of FCP, agreed to use the money to fund the cabin. Lucille sent $6,000 to the accountant for that purpose.

In 2013, Thomas paid salaries to FCP's officers instead of dividends to its shareholders because he and Lucille were using their salaries to fund the cabin. He also represented to Lucille that Jonathan and Frank III were part owners of the cabin. Thomas began teaching his son and another nephew the operations of FCP and the cabin so they could assume those duties when he was no longer able to fulfill them.

In July 2015, Thomas asked Lucille for $25,000 to cover cabin expenses for the years 2013-2015, and he instructed her to send the check to FCP's accountant.

In September 2015, Thomas declared that he owned the cabin and the permit exclusively, and that the plaintiffs had no right or interest in either. He asserted the right to deny anyone access to the cabin. He closed the Bank of America account and withdrew all its money, claiming it belonged to him. He changed the door locks and asserted exclusive control over all personal property at the cabin. He has not provided access to the cabin to plaintiffs, and in some instances, he has banned others from the property.

Plaintiffs allege that Thomas is threatening to sell the cabin, abandon the permit, and keep all sale proceeds without their consent and the consent of other legal owners.

5

B.      *Litigation*

Plaintiffs filed this action in Los Angeles County Superior Court on February 5, 2016.  Thomas and his wife, defendant Kris Capra, reside in Los Angeles County.  Thomas threatened to move for sanctions if the case was not transferred to Mono County.  Plaintiffs entered into a stipulation transferring the case there.

1.      *Motion to disqualify Thomas's attorney*

In September 2016, plaintiffs filed a motion to disqualify Thomas's counsel, Emanuel Barling, Jr., from representing Thomas.  They claimed Barling was FCP's past and current corporate counsel.  He also had represented FCP shareholders, including plaintiffs, in many legal matters.  And he had provided legal counsel to Frank III for at least 10 years.  The trial court denied the motion, finding no evidence of concurrent representation and no evidence that Barling had represented the plaintiffs or had a relationship with them.  Plaintiffs filed an appeal from this order.

2.      *The Sustained Demurrer*

Plaintiffs filed their second amended complaint on September 12, 2016.  Thomas filed his third demurrer.  The trial court sustained the demurrer without prejudice.  The court decided it did not have jurisdiction to try this matter, believing that the Riverside County Superior Court had exclusive jurisdiction under Probate Code section 17000 to try this matter since Frank Sr.'s estate was probated in that court and the probate court had ordered the cabin and the permit to be transferred to the trust.  The court did not address Thomas's other grounds supporting the demurrer.

The trial court entered judgment of dismissal on January 19, 2017.  Plaintiffs appealed from the judgment.  Thomas filed a cross-appeal contending the dismissal should have been with prejudice.

### 3. *Request for injunctive relief*

On February 27, 2017, Lucille filed a petition with the Riverside County Superior Court, Indio Branch, sitting in probate. She sought relief under Probate Code sections 850, personal property possessed by another, and 17200, internal affairs of a trust. She also alleged the same causes of action plaintiffs had alleged in this matter. She further alleged that Thomas had listed the cabin for sale, and she sought temporary and preliminary injunctive relief.

The Riverside County court abated the petition because this matter was pending before us. The Court of Appeal for the Fourth Appellate District affirmed the abatement. (*Capra v. Capra* (Feb. 26, 2019, D074706) [nonpub. opn.] [2019 Cal.App.Unpub. LEXIS 1320].)

On July 11, 2017, plaintiffs applied to the Mono County Superior Court for injunctive relief. They alleged that Thomas had again listed the cabin for sale without consulting with Lucille. The trial court denied the request. It found that it lacked jurisdiction to issue the order due to the pending appeal and for the reasons it had expressed on sustaining the demurrer. It also found there was insufficient evidence that plaintiffs would suffer irreparable harm.

Plaintiffs petitioned this court for writ relief from the trial court's denial of their application for an injunction. We denied the petition. (*Capra v. Superior Court* (Sept. 20, 2017, C085560).) (Plaintiffs' and Thomas's requests for judicial notice of court filings regarding the probate court petition and plaintiffs' application for injunctive relief are denied as moot.)

Plaintiffs filed a notice of appeal from the trial court's order.

7

DISCUSSION

Plaintiffs' Appeal

I

*Dismissal for Lack of Jurisdiction*

The trial court dismissed the action without prejudice because it believed the Riverside County probate court had exclusive jurisdiction under Probate Code section 17000 over matters concerning the internal affairs of the Capra Family Trust by having probated Frank Sr.'s estate. Plaintiffs contend the trial court erred by dismissing this action for lack of jurisdiction, claiming the court had jurisdiction under Probate Code section 17000 to hear the case. They also claim the court committed reversible error by dismissing the action instead of transferring it to Riverside County Superior Court. However, they assert that venue was proper in Mono County to the extent maintenance of the cabin constitutes the day-to-day administration of the trust.

We agree that the Mono County Superior Court had jurisdiction to try this matter and erred by dismissing it on that basis. However, whether Mono County is a proper venue is in this instance a factual question that has yet to be addressed by the trial court.

The term "jurisdiction" has different meanings, depending on the context in which it is used. Its fungible nature and its relationship with the related doctrine of venue can often cause confusion.

In its truest sense, jurisdiction refers to a court's authority to try the case before it. This is a court's jurisdiction in a fundamental sense, the competency or inherent authority to hear a case and render a valid judgment. (*Harnedy v. Whitty* (2003) 110 Cal.App.4th 1333, 1344-1345.) "Fundamental jurisdiction is, at its core, authority over both the subject matter and the parties." (*People v. Chavez* (2018) 4 Cal.5th 771, 780.) Any ruling issued by a court that lacks fundamental jurisdiction is void. (*Ibid*.) Fundamental

8

jurisdiction is statewide and not specific to any one county. "The process of superior courts shall extend throughout the state." (Code Civ. Proc., § 71.)

Another layer of jurisdiction exists. For jurisdictional purposes, civil actions and proceedings are classified as " 'in personam,' " " 'in rem,' " or " 'quasi in rem,' " depending on the nature of the judgment sought. (*Shaffer v. Heitner* (1977) 433 U.S. 186, 199 [53 L.Ed.2d 683].) An action that seeks to impose a personal liability or obligation on the defendant in the plaintiff's favor is an in personam action, and the court must have jurisdiction over the defendant. (*Kulko v. Superior Court* (1978) 436 U.S. 84, 91 [56 L.Ed.2d 132].)

If the court's jurisdiction is based on its authority over property within its territory, the action is " 'in rem' " or " 'quasi in rem.' " In rem jurisdiction is traditionally based on the location of the property that is the subject of dispute within the territorial limits of the state. (*Shaffer v. Heitner, supra*, 433 U.S. at p. 199.) The effect of a judgment in such a case is limited to the property that supports jurisdiction and does not impose a personal liability or obligation on the property owner, because the owner is not before the court. (*Ibid.*) An in rem action or proceeding seeks to affect the interests of all persons in a particular property or thing. (*People ex rel. Gwinn v. Kothari* (2000) 83 Cal.App.4th 759, 765.) A quasi in rem action is brought against someone personally, but the real objective is to deal with particular property. (*People v. Pollard* (2001) 90 Cal.App.4th 483, 489-490.)

Probate proceedings are proceedings in rem. The probate department of a superior court has jurisdiction to determine the interests of all parties connected with the property of a decedent based on the property's location within the state. (*Estate of Nash* (1955) 132 Cal.App.2d 233, 237; Prob. Code, § 7050.)

In addition to the rules of fundamental and in rem jurisdiction, state statutes declare that the probate department of a superior court has "exclusive jurisdiction" over certain types of actions. For example, the probate department has exclusive jurisdiction

to probate and interpret a will, determine entitlement to distribution, and administer and distribute a decedent's estate. (Prob. Code, §§ 8200-8272, 21120-21122, 11700-11705, 9600 et seq., 11600 et seq.) The probate department also has exclusive jurisdiction over proceedings concerning the "internal affairs" of inter vivos trusts, even if the trust property is administered outside of probate. (Prob. Code, § 17000, subd. (a).)

Use of the term "exclusive jurisdiction" in these contexts is somewhat misleading. The term does not refer to jurisdiction in the "fundamental," "in personam" or "in rem" sense. Rather, it concerns assigning exclusive responsibility over certain actions to a superior court's probate department as against other departments *in that same county superior court*, such as the departments that hear civil matters. "Exclusive jurisdiction" in the Probate Code does not distinguish between different county superior courts. (See *Estate of Bowles* (2008) 169 Cal.App.4th 684, 695-696; *Harnedy v. Whitty, supra*, 110 Cal.App.4th at pp. 1344-1345.)

In contrast to jurisdiction, venue concerns which county superior court having fundamental jurisdiction is the proper court geographically to try the action. Statutes designate which county superior court is "the" or "a" proper court for trying the action. (*Battaglia Enterprises, Inc. v. Superior Court* (2013) 215 Cal.App.4th 309, 313.)

Jurisdiction and venue can become intertwined, but in most actions, venue rules are not jurisdictional. If an action is filed in a court that has fundamental jurisdiction to try the matter but is not the proper venue, and the defendant does not object, that court can render an enforceable judgment that is not subject to collateral attack. (*Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 121-122.)

With these doctrines in mind, we can determine that the trial court erred by dismissing the action based on the exclusive jurisdiction assigned to superior courts sitting in probate. Initially, we note that fundamental jurisdiction is not at issue. The second amended complaint alleges causes of action for declaratory relief, conversion, breach of fiduciary duty, constructive trust, trespass to chattel, two counts of fraud and

concealment, theft by false pretense, fraud and deceit, and negligent misrepresentation. There is no dispute that the Mono County Superior Court has fundamental jurisdiction to try these matters.

However, the trial court erred when it concluded that the Riverside County Superior Court sitting in probate had "exclusive jurisdiction" to try this case. The court believed the Riverside County probate court had exclusive jurisdiction because that court administered Frank Sr.'s estate, including transferring the estate's residual property into the trust, and under Probate Code section 17000 "[t]he superior court having jurisdiction over the trust pursuant to this part has exclusive jurisdiction of proceedings concerning the internal affairs of trusts." (Prob. Code, § 17000, subd. (a).) But as just explained, "exclusive jurisdiction" under section 17000 refers only to whether a matter should be heard in a superior court's probate department or in another department of that same superior court. Nothing in the statute vests jurisdiction or venue in one superior court as against a different county superior court.

More significantly, this action does not arise from the probate of Frank Sr.'s estate. It does not concern the settlement of the estate, a testamentary trust, or the enforcement of the probate court's orders. It concerns what the parties did with the cabin and the permit *after* the estate had been settled and those assets had been transferred into an inter vivos trust that existed outside of probate. The administration of Frank Sr.'s estate has been closed since 1993, and the probate court did not assert any form of continuing jurisdiction or supervision over it. The probate court's in rem jurisdiction over a decedent's assets does not exist in the absence of a probate estate. (*David v. Hermann* (2005) 129 Cal.App.4th 672, 682 [prior probate of will did not deprive a different county superior court of jurisdiction to hear challenge to the validity of an inter vivos trust related to the will].) Similarly, the probate court's continuing and exclusive jurisdiction "presupposes an estate subject to administration." (*Ibid*.) There is no estate subject to administration here, and the cabin and permit are no longer property of the

11

estate. "In the absence of the same subject matter, [the parties] cannot rely on the rule that 'the tribunal in which jurisdiction first attaches retains it exclusively.' [Citations.]" (*Ibid.*) The Riverside County court thus is not the proper court to try this matter merely because it probated and closed a related estate 27 years ago. The trial court erred in dismissing the action based on lack of exclusive jurisdiction under Probate Code section 17000 and in finding that Riverside County Superior Court had exclusive jurisdiction to hear this matter.

Because the Mono County Superior Court has fundamental jurisdiction, and the Riverside County Superior Court does not have exclusive or continuing jurisdiction over this action, the question at issue is whether Mono County was a proper venue.

Different venue statutes apply depending on whether the cabin and the permit are still held in trust and this is an action concerning the trust's internal affairs, or whether the assets are no longer held in trust and this is an action over land. The proper venue for a proceeding regarding the internal affairs of a trust is the county of the trust's principal place of administration. (Prob. Code, § 17005, subd. (a)(1).) In contrast, venue for an action over land that does not concern the internal affairs of a trust is generally proper in the county where the land is located. (Code Civ. Proc., § 392, subd. (a).)

The complaint is vague on the ownership status of the cabin and permit. It acknowledges that the probate court transferred the assets to the parties as trustees, but it also acknowledges that the trust declaration directed that after the assets were transferred to the trust, they were to be distributed to Frank Jr., Lucille, and Thomas in equal shares and not in trust. In the complaint's third cause of action for breach of fiduciary duty, Lucille alleges she is a co-trustee and that the cabin and permit "must be held by the Trustees for the benefit of the Beneficiaries." But she also alleges that she transferred her interest in the assets to her personal trust in 2001.

Plaintiffs alleged in their complaints that the principal place of the trust's administration was Los Angeles County where Thomas and Kris reside, and that is where

12

they filed their original complaint. However, Thomas insisted that venue was proper in Mono County because this was an action over rights to land, and he threatened to seek sanctions if plaintiffs did not stipulate to transfer the case there. Plaintiffs acceded to the demand and stipulated to transferring the case to Mono County. They claim before us that the trial court erred by not transferring the case to Riverside County, but they assert that to the extent the activity of maintaining the cabin is considered the trust's day-to-day activity, venue was proper in Mono County.

Thomas criticizes plaintiffs for arguing inconsistent theories; that the court should have transferred the case to Riverside County but stating that venue in Mono County is proper. Despite his earlier insistence that venue was proper in Mono County, Thomas agrees with plaintiffs that venue lies in Riverside County if this is an action based on rights in the family trust, but he asserts plaintiffs have forfeited seeking that relief because they did not timely file a motion to change venue in the Mono County court. He asserts that Lucille's filing of her new action in Riverside County reflects plaintiffs' acceptance of the Mono County court's dismissal of this action and renders this appeal moot. He further claims this action should be dismissed with prejudice because the correct parties are now suing in Riverside County and plaintiffs are barred from recovering in this matter for the reasons he raises in his cross-appeal.

Neither side persuades us. If this action is one over land, then Mono County is a proper venue. (Code Civ. Proc., § 392, subd. (a).) If, however, this is an action challenging the internal affairs of a trust, then Mono County may not be a proper venue as it does not appear to be the trust's principal place of administration. Under Probate Code section 17002, subdivision (a), a trust's principal place of administration "is the usual place where the day-to-day activity of the trust is carried on by the trustee or its representative who is primarily responsible for the administration of the trust." No alleged facts show that Thomas carries on the day-to-day activity of the trust at the cabin.

13

Probate Code section 17002 continues:  "If the principal place of administration of the trust cannot be determined under subdivision (a), it shall be determined as follows: [¶] . . . [¶]  (2) If the trust has more than one trustee, the principal place of administration of the trust is the residence or usual place of business of any of the cotrustees as agreed upon by them or, if not, the residence or usual place of business of any of the cotrustees."  (Prob. Code, § 17002, subd. (b)(2).)  Thomas resides in Los Angeles County, where plaintiffs filed their initial complaint, not Mono County.

Thomas's arguments fare no better.  Venue is not proper in Riverside County.  Neither the trust's principal place of business nor the contested property are located there, and this case does not concern an estate being probated there.  Lucille's recent filing of her action there does not necessarily indicate plaintiffs have accepted the Mono County court's dismissal.  If that were so, plaintiffs would have dismissed this appeal.

Thomas is incorrect to criticize plaintiffs for not filing a motion to change venue based on Mono County being an improper venue.  That right is extended only to the defendant.  (Code Civ. Proc., §§ 396b, subd. (a); 397, subd. (a).)  Moreover, that right is limited.  Depending on the circumstances, a failure to move for a change of venue at the time of a demurrer or answer on the basis that the complaint was filed in the wrong court could forfeit the defendant's right to have venue changed where the evidence shows the defendant intended to waive the right or to invoke the jurisdiction of the court where the action was commenced.  (*Lyons v. Brunswick-Balke-Collender Co.* (1942) 20 Cal.2d 579, 583-584.)  Thomas demanded the action be moved to Mono County, then argued in his demurrers that the case should be moved to Riverside County, but he did not file a motion to change venue.  "Waiver is ordinarily a question of fact" (*id.* at p. 583), and it is one the trial court has not yet been asked to address.

The Mono County Superior Court has fundamental jurisdiction to try this matter.  It thus erred by sustaining the demurrer and dismissing the case based on lack of so-called exclusive jurisdiction under Probate Code section 17000, as this action does not

14

raise the Riverside County probate court's jurisdiction.  But whether Mono County is the proper venue is a question we leave for the trial court to address on motion on remand.

## II

### *Motion to Disqualify Counsel*

Plaintiffs contend the trial court abused its discretion when it denied their motion to disqualify Emanuel Barling, Jr., from representing Thomas in this action.  They assert four reasons:  (1) substantial evidence shows Barling concurrently represented FCP and Thomas; (2) substantial evidence shows Barling previously represented plaintiffs in connection with a dispute settlement; (3) substantial evidence shows Barling had an attorney-client relationship with Frank III; and (4) the doctrine of successive representation precludes Barling from representing Thomas in this action because there is a substantial relationship between the subjects of the current and former matters.  We disagree with plaintiffs' contentions.

### A.     *Background*

The following evidence was presented by the parties on plaintiffs' motion to disqualify Barling as well as motions by Thomas for sanctions and to disqualify plaintiffs' counsel.  John R. Capra (John R., sometimes referred to as Jack), is Lucille's son, secretary of FCP, and an attorney.  He declared that Barling had been FCP's counsel for over 20 years.  John R. also claimed that Barling represented both FCP and each of its shareholders in a 2014 confidential settlement.  FCP and each of the shareholders received a monetary payment as part of the settlement based upon their shares in FCP.  Barling did not obtain written consent from the plaintiffs to represent Thomas in this action.

Barling denied ever representing FCP.  He has never represented or had a relationship with any of the plaintiffs.  Kris declared that she and Thomas had asked Barling to assist them on a few matters over the years and to do some work in 2011 or

15

2012 when FCP's attorney was not available. She also claimed that Barling represented only Thomas in the 2014 confidential settlement.

Although licensed by the state bar, Barling did not practice law from 1997 until 2011 due to his and his wife's health and his other work. An attorney named Joseph Adelman, a friend of Frank Sr. and Frank Jr., was FCP's counsel until his death in 2012 or 2013. Kris stated that Barling was FCP's legal counsel from 2011 to 2012. In 2012, FCP retained Roger Goff of the firm Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP, as its general counsel. Barling helped Thomas, FCP's president, select the new counsel.

In late 2011 or early 2012, Thomas and Kris asked Barling to participate in the development of a film on Frank Sr.'s life to be called "Night Voices." Kris stated that Barling did not represent FCP in this matter as a lawyer. After Goff became general counsel, Barling became an independent executive producer on the project. Barling got "tied into" FCP because the movie studio requested a chain of title from the Capra family members, and Barling offered to help. Barling encountered difficulty obtaining Frank III's signature on the paperwork. Because of this incident, Barling would never represent Frank III, and Frank III had not spoken to Barling since.

In 2014, Barling had several contacts with the parties. In March of that year, Frank III inquired by email about the status of the "Night Voices" project. He sent the email to Thomas, with copies to Lucille, John R., and Barling. Thomas responded to Frank's emails. The following day, Barling augmented Thomas's email in an email to Lucille, with copies to the same parties. He provided additional observations about the project's status. He said that production was being delayed because the first screenplay was not satisfactory, and he and others had been meeting for several weeks about changes they wanted made.

That same year, FCP had negotiations with The Archdiocese of Granada, Spain to name a theater and an art house cinema after Frank Sr. By email dated March 30, 2014, Frank III provided Barling's contact information to a third party. He described Barling as

16

"legal representation for the Capra Family in regard to Archbishop Javier's request." Barling reviewed the proposed agreement with the archdiocese, and in an email to Thomas in May 2014 said he made some small revisions to the agreement. Barling sent copies of the email to plaintiffs and John R. The agreement was between the archdiocese and FCP. It required notices sent to FCP to be copied to Barling.

Also in 2014, Barling participated in the confidential settlement that John R. mentioned in his declaration. The settlement involved unpaid royalties from Sony/Columbia Pictures. Barling stated he represented only Thomas in that matter, contrary to John R.'s statement. The settlement discussions were directed to the individual heirs because they received their payments directly from Sony, not from FCP. When the settlement was reached, settlement funds were mailed directly to the heirs, not to FCP.

Thomas, Kris, FCP's accountant Joel Landson, and Barling met with Sony representatives one time to negotiate the settlement. A day or two before the meeting, Sony's counsel circulated a confidentiality agreement and required everyone to sign it, including John R. on behalf of plaintiffs and Barling on behalf of the "Capra Parties." Barling called Sony's counsel and said he was not representing anyone other than Thomas. Counsel asked him to sign the agreement to avoid delaying the meeting. Barling agreed to sign it after stating he would not sign it on behalf of the Capra parties.

At the settlement meeting, Barling told the Sony representatives that he represented only Thomas and none of the other Capra heirs. Lucille, Frank III, and Jonathan were being represented by John R. Barling also said that Deborah and Christina (Frank Jr.'s widow and daughter) were not represented by counsel, but he felt they would sign any agreement that provided reasonable compensation. Landson confirmed these facts in his declaration.

17

Barling also told Sony representatives that there could be problems obtaining Frank III's agreement based on the incident he had had with him, and that John R. would have to deal with Frank III.

FCP became a party to the agreement because Thomas knew his relatives would not pay the accounting and legal fees incurred once they received their settlement payments. Since those fees were paid by Sony to FCP, Thomas was asked to sign the settlement agreement on behalf of FCP. John R. was also named as a party to the agreement.

The parties reached a settlement with Sony on August 11, 2014. Kris related the information to the parties by phone, and then Barling followed up with an email to plaintiffs and copies to Thomas and John R. Barling explained how the negotiating parties arrived at a settlement. He said, "Tom, Kris and I got them up to the $900,000 mark with attorneys' fees, accountants' fees and costs." He also said, "One of the reasons why Sony sweetened the deal was my threat that the Capra family would join in the class action and at least Tom would become a plaintiff." To get the parties' signatures quickly, he asked the parties to sign a signature page, scan it and email it to him, and mail the originals to his home. He concluded the email by saying, "I will keep all of you appraised of when the agreement will be ready to sign and I will always be available to answer your questions. . . . [¶] Since Jack is Secretary of FCP and my co-counsel on everything, he will have access to the settlement terms and agreement. I am certain he can answer your questions too."

John R. responded to Barling's email by reminding all the parties of the potential tax consequences of the settlement to each of them.

In September 2014, Barling sent FCP a statement for his services. The statement described the work he had performed as follows: "Work on various projects unrelated to Night Voices including but not limited to Sony/Columbia royalties; contact with AGICOA, remake of Pocket Full of Miracles; Request from Archbishop of Granada,

18

Spain to name facility after Frank Capra and many others pursuant to agreement . . . ." Barling charged $55,025 for his services. In an email to accountant Landson, Kris stated that Barling's invoice "[was] correct. I got the extra $30K so I could give him another $5000 for work he did for other members of the family for free. He wrote several contracts and I am sure 5K is not enough but he agreed to take it."

Barling had an additional contact with plaintiffs in 2014. On October 10 of that year, Frank III sent an email to Thomas, Lucille, Jonathan, and John R. saying he was not aware that "Lady for a Day" was being sold in the retail market through Amazon. Although the email had not been addressed to him, Barling responded to the group. He said that FCP's former counsel, Mr. Adelman, made the deal without consulting with Thomas, Kris, or himself. Kris was going through Adelman's files to see what was done. Barling and John R. then continued the conversation by email regarding the need to recreate corporate minutes for FCP and identify its officers.

John R. submitted a later declaration to the court. Based upon the email communications involving the Night Voices screenplay, the contract with the Granada archdiocese, and the attempts to identify FCP's officers, John R. "believed" Barling was acting as FCP's attorney. John R. also believed that based upon Barling's participation in the Sony royalty settlement, Barling was acting on behalf of all FCP shareholders, not just Thomas. Unlike John's earlier declaration, this declaration did not state that Barling had been FCP's counsel for over 20 years.

Kris stated that Barling on occasion had helped Thomas by reading a contract. She said Barling "does work for us on occasion mostly for free . . . . And I totally understand that this work is still work for FCP even though it is free."

As this dispute broke out in 2015, Thomas and John R. exchanged emails. Part of John R.'s response to Thomas stated, "I am not sure what you mean by expecting me to cc you on any and all communications I have with my family, but that is not going to

happen, especially with my mother [Lucille] when we are in an attorney-client privileged communication . . . ."

Before plaintiffs filed this action in 2016, Lucille and John R. requested through their attorney to inspect FCP's books and records. They sent their request to accountant Landson, who forwarded it to Barling. In his response, Barling stated he would "coordinate calendars with Mr. Landson and the President of FCP to arrange the earliest possible meeting." He also wrote that his "clients" wanted to know who would attend the inspection. They would not permit inspection by anyone who was not in the chain of attorney-client privilege because some of the documents were confidential, and disclosure of information from them could "cause FCP, and other members of the Capra family" to sizable damages. Barling said he represented Thomas at the document inspection.

Barling represented Thomas in this action from its beginning. After the trial court sustained Thomas's first demurrer and ordered plaintiffs to respond to discovery, Barling by letter dated August 1, 2016, responded to a letter he had received from plaintiffs' counsel. As part of his response, Barling stated, "As to your ad hominem comments about me, your clients should know who I am because I am the one who has recovered more than a million dollars for them in royalties from various motion picture companies. I am certain that Frankie is still angry at me for trying to intervene in his drug/alcohol addition [*sic*] four years ago. He has not spoken to me since. But, he had no trouble asking me for free advice for at least a decade."

Later that month, plaintiffs served a deposition subpoena for business records on Barling. They sought Barling's client files regarding his representation of FCP, including "retainer/billing agreements, bills, records of payment received, communications with client, communications with third parties on behalf of client and contracts between [FCP] and other parties." They also served a subpoena on Thomas and Kris to inspect the same types of records in their possession.

20

Barling objected to the subpoena in part based on attorney-client and work product privileges. He stated, "The requested material was created during an attorney-client relationship and the client has not authorized any release of the requested documents nor have they waived either privilege."

The trial court denied plaintiffs' motion to disqualify Barling from representing Thomas in this action. It found no evidence of concurrent representation, and as to successive representation, it found no evidence that Barling represented "Plaintiff-Shareholders" and no evidence that Barling had a relationship with Frank III.

B.     *Analysis*

" 'Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion. [Citations.]' ([*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc*. (1999) 20 Cal.4th 1135,] 1143 [(*SpeeDee*)].) As to disputed factual issues, a reviewing court's role is simply to determine whether substantial evidence supports the trial court's findings of fact; 'the reviewing court should not substitute its judgment for . . . express or implied [factual] findings [that are] supported by substantial evidence. [Citations.]' (*Ibid.*) As to the trial court's conclusions of law, however, review is de novo; a disposition that rests on an error of law constitutes an abuse of discretion. (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712; *People v. Superior Court (Humberto S.)* 43 Cal.4th 737, 742.) The trial court's 'application of the law to the facts is reversible only if arbitrary and capricious.' (*Haraguchi, supra,* at p. 712.)" (*In re Charlisse C.* (2008) 45 Cal.4th 145, 159.)

When substantial evidence supports the trial court's denial of a motion to disqualify counsel, "an appellate court must uphold that decision." (*Toyota Motor Sales, U.S.A., Inc. v. Superior Court* (1996) 46 Cal.App.4th 778, 782.) "Credibility, even when based upon conflicting declarations, is determined by the trial court." (*Id*. at p. 783.)

The California Supreme Court has explained motions to disqualify counsel as follows: "The authority of a trial court 'to disqualify an attorney derives from the power inherent in every court "[t]o control in furtherance of justice, the conduct of its ministerial officers." ' ([*SpeeDee, supra*,] 20 Cal.4th [at p.] 1145 [], quoting Code Civ. Proc., § 128, subd. (a)(5).) 'Ultimately, disqualification motions involve a conflict between the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility.' (*SpeeDee,* at p. 1145.) As we have explained, however, '[t]he paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar.' (*Ibid.*)

"When disqualification is sought because of an attorney's successive representation of clients with adverse interests, the trial court must balance the current client's right to the counsel of its choosing against the former client's right to ensure that its confidential information will not be divulged or used by its former counsel.

"Two ethical duties are entwined in any attorney-client relationship. First is the attorney's duty of confidentiality, which fosters full and open communication between client and counsel, based on the client's understanding that the attorney is statutorily obligated (Bus. & Prof. Code, § 6068, subd. (e)) to maintain the client's confidences. (*SpeeDee, supra,* 20 Cal.4th at p. 1146.) The second is the attorney's duty of undivided loyalty to the client. (*Flatt v. Superior Court* (1994) 9 Cal.4th 275, 282 (*Flatt*).) These ethical duties are mandated by the California Rules of Professional Conduct. (Rules Prof. Conduct, rule 3-310(C) & (E) [now rules 1.7 and 1.9, respectively, effective November 1, 2018].)

"The interplay of the duties of confidentiality and loyalty affects the conflict of interest rules that govern attorneys. An attorney who seeks to simultaneously represent clients with directly adverse interests in the same litigation will be automatically

22

disqualified.  (*Flatt, supra,* 9 Cal.4th at p. 284, fn. 3.)[1]  Moreover, an attorney may not switch sides during pending litigation representing first one side and then the other.  (*City of Santa Barbara v. Superior Court* (2004) 122 Cal.App.4th 17, 23.)  That is true because the duty to preserve client confidences (Bus. & Prof. Code, § 6068, subd. (e)) survives the termination of the attorney's representation.  (*SpeeDee, supra,* 20 Cal.4th at p. 1147.)

"That enduring duty to preserve client confidences precludes an attorney from later agreeing to represent an adversary of the attorney's former client unless the former client provides an 'informed written consent' waiving the conflict.  (Rules Prof. Conduct, rule 3-310(E).)  If the attorney fails to obtain such consent and undertakes to represent the adversary, the former client may disqualify the attorney by showing a ' "substantial relationship" ' between the subjects of the prior and the current representations.  (*Flatt, supra,* 9 Cal.4th at p. 283.)  To determine whether there is a substantial relationship between successive representations, a court must first determine whether the attorney had a direct professional relationship with the former client in which the attorney personally provided legal advice and services on a legal issue that is closely related to the legal issue in the present representation.  (*Jessen v. Hartford Casualty Ins. Co.* (2003) 111 Cal.App.4th 698, 710-711.)  If the former representation involved such a direct relationship with the client, the former client need not prove that the attorney possesses actual confidential information.  (*Id.* at p. 709.)  Instead, the attorney is presumed to possess confidential information if the subject of the prior representation put the attorney in a position in which confidences material to the current representation would normally

---

[1]     The same rule holds even where the simultaneous representations involve unrelated matters.  "Even though the simultaneous representations may have *nothing* in common, and there is *no* risk that confidences to which counsel is a party in the one case have any relation to the other matter, disqualification may nevertheless be *required.* Indeed, in all but a few instances, the rule of disqualification in simultaneous representation cases is a *per se* or 'automatic' one."  (*Flatt, supra*, 9 Cal.4th at p. 284, original italics.)

have been imparted to counsel. (*Flatt, supra,* 9 Cal.4th at p. 283; *Adams v. Aerojet-General Corp.* (2001) 86 Cal.App.4th 1324, 1332; *H.F. Ahmanson & Co. v. Salomon Brothers, Inc.* (1991) 229 Cal.App.3d 1445, 1453-1454.) When the attorney's contact with the prior client was not direct, then the court examines both the attorney's relationship to the prior client and the relationship between the prior and the present representation. If the subjects of the prior representation are such as to 'make it likely the attorney acquired confidential information' that is relevant and material to the present representation, then the two representations are substantially related. (*Jessen v. Hartford Casualty Ins. Co., supra,* 111 Cal.App.4th at p. 711; see *Farris v. Fireman's Fund Ins. Co.* (2004) 119 Cal.App.4th 671, 680 [material confidential information is that which is 'directly at issue in' or has 'some critical importance to, the second representation'].) When a substantial relationship between the two representations is established, the attorney is automatically disqualified from representing the second client. (*Flatt, supra,* 9 Cal.4th at p. 283; see Hazard and Hodes, The Art of Lawyering (3d ed. 2000 & 2005-2 supp.) § 13.5, pp. 13-12—13-13.)" (*City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 846-847 (*Cobra Solutions*).)

Plaintiffs contend that contrary to the trial court's finding of no substantial evidence, (1) substantial evidence shows Barling concurrently represented FCP and Thomas; (2) substantial evidence shows Barling previously represented plaintiffs in their roles as shareholders in FCP; (3) substantial evidence shows Barling had a relationship with Frank III; and (4) the doctrine of successive representation precludes Barling from representing Thomas in this action.

Preliminarily, we note that plaintiffs' substantial evidence contentions miss the mark. Their claims that substantial evidence exists in the record to support their arguments, even though the trial court found no such substantial evidence, do not establish prejudicial error. We do not review the trial court's reasoning; we review its judgment. "[A] ruling or decision, itself correct in law, will not be disturbed on appeal

24

merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." (*Davey v. Southern Pac. Co.* (1897) 116 Cal. 325, 329.)

More significantly, because we review for the existence of substantial evidence in support of the court's factual findings, plaintiffs' burden on appeal in this matter is not to establish that substantial evidence supports an opposite finding. Rather, plaintiffs must show that substantial evidence in the record establishes *only* that a concurrent or successive and substantially related representation or relationship existed between them and Barling. "With rhythmic regularity it is necessary for us to say that where the findings are attacked for insufficiency of the evidence, our power begins and ends with a determination as to whether there is *any* substantial evidence to support them; that we have no power to judge of the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom." (*Overton v. Vita-Food Corp.* (1949) 94 Cal.App.2d 367, 370, original italics.)

Plaintiffs have not met their burden. First, there is no evidence Barling is concurrently representing Thomas and any of the plaintiffs. Plaintiffs argue the evidence shows Barling is concurrently representing Thomas and FCP. But disqualifying Barling in this matter depends upon his relationship with plaintiffs, not with FCP. (*Cobra Solutions, supra*, 38 Cal.4th at p. 847.) FCP is not a party to this action. And although plaintiffs are shareholders in FCP, they did not bring this action as a shareholders' derivative action. They thus do not represent FCP and cannot seek to disqualify Barling on FCP's behalf. (See *Coldren v. Hart, King & Coldren, Inc.* (2015) 239 Cal.App.4th 237, 246-247 [former shareholder in a law firm had no standing to disqualify defendant firm's counsel where claims were direct, not derivative].) The trial court did not abuse its discretion in determining there was no evidence of concurrent representation.

25

Second, the trial court did not abuse its discretion in determining there was no conflicting successive representation by Barling. Substantial evidence supports the court's findings that Barling has not represented plaintiff-shareholders and had no conflicting relationship with Frank III.

Barling did not return to the practice of law until 2011. When he returned to the practice, he helped Thomas find a new general counsel for FCP, participated as an independent executive producer in the Night Voices project, and arguably represented FCP in 2014 in reaching an agreement with the Archdiocese of Granada, investigating the marketing of "Lady for a Day," and working with John R. to recreate FCP minutes. During these actions in 2014, Barling's client was Thomas or FCP, not plaintiff shareholders.

Plaintiffs claim that as "corporate counsel" for FCP, Barling "necessarily represented" them as shareholders, and thus their consent to his representation of Thomas in this action was required. Not so. Assuming that Barling represented FCP in certain matters does not "necessarily" mean he also represented plaintiffs individually.

The California Rules of Professional Conduct require an attorney who represents an organization to consider the client to be the organization itself, acting through the highest authorized officer, employee, department, or other entity involved in the particular issue. (Rules Prof. Conduct, rule 1.13(a).) The attorney's advice may benefit shareholders, but the attorney's duty of loyalty is to the corporation.

"Case law provides the following guidelines: '[A]s attorneys for [a] corporation, counsel's first duty is to [the corporation].' (*Meehan v. Hopps* (1956) 144 Cal.App.2d 284, 293.) Corporate counsel should of course, refrain from taking part in any controversies or factional differences among shareholders as to control of the corporation, so that he or she can advise the corporation without bias or prejudice. (See *Goldstein v. Lees* (1975) 46 Cal.App.3d 614, 622.) Even where counsel for a closely held corporation treats the interests of the majority shareholders and the corporation interchangeably, it is

the attorney-client relationship with the corporation that is paramount for purposes of upholding the attorney-client privilege against a minority shareholder's challenge. (*Hoiles v. Superior Court* (1984) 157 Cal.App.3d 1192, 1198.) 'These cases make clear that corporate counsel's direct duty is to the client corporation, not to the shareholders individually, even though the legal advice rendered to the corporation may affect the shareholders.' (*Skarbrevik v. Cohen, England & Whitfield* (1991) 231 Cal.App.3d 692, 704.)" (*Metro-Goldwyn-Mayer, Inc. v. Tracinda Corp.* (1995) 36 Cal.App.4th 1832, 1842.)

Plaintiffs cite to *Woods v. Superior Court* (1983) 149 Cal.App.3d 931 (*Woods*) to support their claim that Barling necessarily represented them when he represented FCP. *Woods* is distinguishable. In that action, wife moved to disqualify husband's attorney in the couple's marriage dissolution action. Husband's attorney was and had been the family corporation's attorney for years. Wife had shared with counsel her feelings on matters potentially relevant to the dissolution, and counsel had drafted wife's will. (*Id*. at p. 933.) The court of appeal issued a writ directing the trial court to grant the wife's motion. Wife had moved to join the corporation to the dissolution action and thus made its control a significant issue. The court of appeal stated, "We believe [counsel] necessarily represents *both* husband's and wife's interests in his role as attorney for the family corporation. A corporation's legal adviser must refrain from taking part in controversies among shareholders as to its control, and when his opinion is sought he must give it without bias or prejudice. (*Goldstein v. Lees*[, *supra*,] 46 Cal.App.3d at p. 622.) [¶] We believe the fact that [counsel] continues to represent wife's interest in a family business which will be the focus of the marital dissolution is sufficient to disqualify [counsel] from representing husband." (*Woods, supra*, 149 Cal.App.3d at p. 936, original italics.) In effect, division of the family business was substantially related to the dissolution of the marriage.

27

We respectfully disagree with *Woods's* statement that the attorney, as counsel for the closely held family corporation, "necessarily" represented both husband's and wife's interests if that statement is taken out of its context. Even in a closely held corporation, the company's attorney owes a duty of loyalty to the corporation, not the shareholders. (*Metro-Goldwyn-Mayer, Inc. v. Tracinda Corp., supra*, 36 Cal.App.4th at p. 1843.) Moreover, unlike the family corporation at issue in *Woods*, FCP and its control are not the focus of this action and thus are not substantially related to it. Plaintiffs are not claiming an interest in the cabin and permit based on their shares in FCP. They claim an interest in those assets either as trustees of the Capra Family Trust or as individual owners having received their interests as beneficiaries of the Capra Family Trust. There is no evidence Barling has represented plaintiffs in either of those roles or FCP in its interactions with plaintiffs in those roles. The focus of this action is on plaintiffs and Thomas, not FCP.

Even if Barling had represented plaintiffs and had a relationship with Frank III, we would still affirm the trial court's ruling. Plaintiffs have not established a substantial relationship between the subjects of the prior and current representations. There is no evidence that Barling personally provided legal advice and services on a legal issue that is closely related to the issue in this action. Assuming for argument only that Barling represented FCP on the "Night Voices" screenplay, the archdiocese contract and recreating minutes for FCP, represented plaintiffs and FCP in the Sony settlement and gave legal advice to Frank III over the years, there is no evidence showing the subjects of any of those matters are even remotely related to the issues in this action—ownership of the cabin and permit and the use of FCP funds to pay for them. There is no evidence Barling has previously represented the Capra Family Trust, FCP, or plaintiffs on matters related to the subject of this action.

Plaintiffs contend there is a substantial relationship because their claims "are inextricably intertwined with ownership, control and operation of FCP, which funded

28

much, if not all, of the operational expense of the Cabin and Permit from at least 2007-2015." Plaintiffs misstate the comparison at issue. The correct test is whether the subject matter of Barling's past and current representations are substantially related. Plaintiffs' claims in this action concern Thomas's assertion of ownership of the cabin while using FCP funds to pay its expenses. There is no evidence that those claims concern the same subject matter as Barling's prior work for FCP and plaintiffs producing "Night Voices," negotiating a naming agreement, recreating minutes and directories, and negotiating a royalty settlement. And there is no evidence of the subject matter of any of Frank III's questions to Barling for legal advice.

To establish a prohibited successive relationship, plaintiffs must do more than show merely that Barling previously represented them or FCP on any type of matter. "[I]t is not the services performed by the attorney that determines whether disqualification is required, it is 'the similarities between the legal problem involved in the former representation and the legal problem involved in the current representation.' [Citation.]" (*Farris v. Fireman's Fund Ins. Co., supra,* 119 Cal.App.4th at p. 681.) While Thomas's actions denying plaintiffs access to the cabin directly affects them, it does not relate to the subject matter of any past representation of them or FCP by Barling. The trial court did not abuse its discretion in making that finding and denying the motion to disqualify Barling.

III

*Denial of Injunctive Relief*

Plaintiffs contend the trial court erred in denying their application for injunctive relief. They filed their application while this appeal was pending to prevent Thomas from selling the cabin. The trial court denied the request because it had lost subject matter jurisdiction when plaintiffs appealed the judgment of dismissal. (Code Civ. Proc., § 916.) The court found that it did not have jurisdiction because the issue of jurisdiction

29

was a primary issue on appeal and granting the injunction would not preserve the status quo.

The court also found, as a separate reason for denying the application, that plaintiffs had not established they would suffer irreparable injury if the relief was not granted. Thomas had maintained the property in good condition and in compliance with all Forest Service permits and regulations. There was no evidence he or Kris would abscond with any funds derived from sale of the property, nor would they intentionally sell the property at less than fair market value. The court found that plaintiffs had adequate remedies available at law if they prevailed in this action.

Plaintiffs claim the trial court erred and that it had jurisdiction to rule on their application while this appeal was pending. We have already determined the trial court had fundamental jurisdiction to try plaintiffs' complaint. Because we are remanding, whether the trial court had jurisdiction to grant the application while this appeal was pending is now moot. The court will have jurisdiction to consider and rule on any similar applications should plaintiffs file them following issuance of the remittitur.

Plaintiffs also contend the trial court abused its discretion by denying the application on its merits. They claim the undisputed facts show they have a reasonable probability of prevailing on the merits and that the court erred by finding they had not established a threat of irreparable harm. As to success on the merits, plaintiffs claim they are likely to succeed on their cause of action against Thomas for breach of a fiduciary duty as co-trustee of the Capra Family Trust. This claim relies on plaintiffs' assertion that the trial court "determined that the Cabin and Permit are the property of the Trust."

The trial court did not make that determination. Ruling on the demurrer to the second amended complaint, the court took judicial notice of the probate court's 1993 distribution order. As stated above, that order distributed Frank Sr.'s residual assets, including the cabin and permit, to the Capra Family Trust. Nothing in that order establishes that the cabin and permit are owned in trust some 27 years later, particularly

30

when the amended trust declaration directed the trustees to distribute the property out of the trust. Whether the assets are owned by the trust is a fact that plaintiffs must establish at trial. Thus, we cannot agree with them that undisputed facts establish their likelihood of success on the merits. Accordingly, we do not reverse the trial court's denial of the application for injunctive relief and need not address plaintiffs' arguments regarding the likelihood of irreparable harm.

### Thomas's Cross-Appeal

Thomas contends the trial court erred by dismissing the action without prejudice. He sets forth many arguments for why the court should have dismissed the action with prejudice. He claims plaintiffs have unclean hands; they lack standing; they cannot establish conversion because they allege in the abated Riverside County action that the trust is the owner; multiple statutes of limitations and the statute of frauds bar recovery; their claim of an oral agreement is barred by the parol evidence rule; and allegations in the complaint are vague and conclusory.

When the trial court sustained Thomas's demurrer without prejudice, it found only that it lacked jurisdiction. It did not address Thomas's other claims in support of the demurrer. Because we hold that the court has jurisdiction to hear this matter, we will remand to allow the trial court to continue the demurrer hearing to address Thomas's arguments in the first instance.

### DISPOSITION

The judgment of dismissal is reversed, the order denying plaintiffs' motion to disqualify defendant's counsel is affirmed, and the appeal from the denial of plaintiffs' application for injunctive relief is dismissed as moot. The matter is remanded. The trial court is directed to vacate its order sustaining the demurrer and to conduct further proceedings consistent with this opinion.

31

The parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(3).)


                                                      _____

                                                      HULL, J.


We concur:


_____

BLEASE, Acting P. J.


_____

DUARTE, J.